Lowell Michael COIL, also known as L. M. Coil, also known as Mike Coil, Appellant,

v.

UNITED STATES of America, Appellee.

No. 17769.

United States Court of Appeals Eighth Circuit.

April 5, 1965.

Richard J. Bruckner, of Schrempp, Lathrop & Rosenthal, Omaha, Neb., David S. Lathrop, of Schrempp, Lathrop & Rosenthal, Omaha, Neb., for appellant.

Frederic J. Coufal, Asst. U. S. Atty., Omaha, Neb., Theodore L. Richling, U. S. Atty., Omaha, Neb., for appellee.

Before VAN OOSTERHOUT, BLACKMUN and MEHAFFY, Circuit Judges.

MEHAFFY, Circuit Judge.

Defendant, Lowell Michael Coil, was tried to a jury in the District Court at Omaha, Nebraska, and convicted under Count I of a five count indictment for violation of 18 U.S.C.A. § 1001. The jury found that he had knowingly concealed a material fact by maintaining a false prescription file at his pharmacy. Defendant's file reflected the dispensing of 450 one-half grain morphine sulfate tablets to Dorothy Williams between June 13, 1963 and September 26, 1963, when, in fact, no more than 120 of such tablets had been dispensed to this customer.

The defendant challenges the sufficiency of the evidence to support the verdict making appropriate a fairly extensive narration of the facts in evidence relative to Count I.

On November 1, 1962 the defendant, a pharmacist, purchased a drugstore located in Omaha, Nebraska. The purchase did not include any prescription items, and defendant obtained his first supply of morphine on June 14, 1963. On September 30, 1963, United States Narcotics Agent Cox checked the defendant's narcotic prescription files. Such an inspection necessitates a checking of the purchases of narcotics from the order copies the druggist is required to keep, the inventory of the narcotics on hand and the prescriptions on file indicating the amount dispensed to customers.

The United States official order forms revealed that defendant had purchased 600 one-half grain morphine sulfate tablets. Defendant's inventory of such tablets was 150 on the inspection date and his record prescriptions, eight in number, indicated the dispensing of 450 of the tablets to Mrs. Dorothy Williams. Thus, the records tallied and would have been accurate provided defendant had in fact dispensed the 450 tablets to Mrs. Williams.

Before Agent Cox left the premises, the defendant asked him about the inventory, admitting knowledge of a shortage of morphine. Defendant told Agent Cox that he attributed the shortage to a suspected theft by a customer, one William M. Ruggiere who was a drug addict. Defendant said that he was aware the law required him to report the shortage, but he had not done so. He explained that he had "slipped" a couple of extra prescriptions to the doctor, obtained the doctor's signature, balanced his inventory, and therefore nothing could be proven against him.

Mrs. Williams had been treated for an incurable disease by her family doctor for some two and one-half to three years. At the time we are concerned with, the doctor did not expect her to live more than a month or two. The doctor had been prescribing a milder form of narcotics, but she was in such pain in June of 1963 the doctor started prescribing one-half grain morphine sulfate tablets. He wrote the first prescription on defendant's drugstore. He told defendant that due to Mrs. Williams' condition she could have all the tablets she needed to relieve her pain. He instructed the druggist to type out the prescriptions as Mrs. Williams' need required, and mail them to him for signature and return. The doc-

tor's suspicion was not aroused until he received large orders from the defendant on two typed prescriptions in one mail for 100 tablets and 50 tablets, respectively. The prescriptions called for Mrs. Williams to take one such tablet every four hours as needed for pain. During this time Mrs. Williams was confined to her bed at home and her husband, Robert S. Williams, was procuring her medicine from defendant. When the morphine sulfate tablets were first prescribed, Mr. Williams made his first purchase of twelve tablets on June 14, 1963. He administered the tablets orally to his wife but this method did not provide the needed relief. He discontinued using them for a while until he learned to administer the drug by hypodermic injection into the bloodstream. His next purchase on August 31, 1963 was also for twelve tablets. He continued periodically to make purchases on eight or nine occasions. Each purchase was for twelve tablets except the final purchase October 1, 1963 for thirty-six tablets. On this last occasion, which was after the narcotic agent had checked defendant's inventory on September 30, 1963, Mr. Williams intended to purchase only twelve tablets, but the defendant told him he had thirty-six on hand, to which he was entitled, and suggested that Williams take them all.

Mr. Williams kept records of his medicinal purchases for income tax purposes. The defendant knew this, and some time after October 9, 1963 (the date the narcotic agent picked up Mr. Williams' records) the defendant engaged Mr. Williams in conversation outside of the drugstore. Defendant asked him if he could buy his purchase records as "it might be the only evidence that could cause him (defendant) any trouble." He further stated that he would rather give Mr. Williams the money than give it to an attorney. The defendant also asked Mr. Williams how many tablets Williams had purchased from him. Williams estimated from 100 to 125.

Government witness Ruggiere lived in the neighborhood of defendant's drug-store and became acquainted with him as a customer some time around October, 1962. He visited the drugstore frequently and testified that defendant sold him one-half grain morphine sulfate tablets on a number of occasions without prescriptions for a price of $10.00 per grain. This witness testified that the largest number of one-half grain tablets he purchased from the defendant at any one time was twenty and the smallest, five. On some of these occasions, the defendant delivered him the narcotics at his home in rubber balloons, explaining narcotic users often carried drugs in rubber balloons so that in the event of apprehension the balloon may be swallowed to hide the evidence without a large quantity of narcotics being fatally dissolved in the body.

Maureen Updegraff, who was living with Ruggiere, testified that on some ten occasions she saw the defendant deliver to Ruggiere balloons containing small white pills and that on each occasion she saw Mr. Ruggiere give the defendant in excess of $50.00.

The defense attempted to establish a theft of morphine tablets by Ruggiere, a drug addict, but the proof was apparently rejected as incredible by the jury.

■■ In testing the evidence to determine its sufficiency, we must consider it in a light most favorable to sustaining the verdict of the jury. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); McIntosh v. United States, 341 F.2d 448 (8th Cir. 1965); Valentine v. United States, 293 F.2d 708, 710 (8th Cir. 1961), cert. denied 369 U.S. 830, 82 S.Ct. 848, 7 L.Ed.2d 795 (1962); Blumenfield v. United States, 284 F.2d 46, 52 (8th Cir. 1960), cert. denied 365 U.S. 812, 81 S.Ct. 693, 5 L.Ed.2d 692 (1961); Bell v. United States, 251 F.2d 490, 491 (8th Cir. 1958); McKenna v. United States, 232 F.2d 431, 435–436 (8th Cir. 1956); Batsell v. United States, 217 F.2d 257, 260 (8th Cir. 1954). We are of the opinion that the evidence was amply sufficient to support the jury's verdict of guilty.

The essential ingredients of the offense are all but admitted. It is undisputed that defendant obtained on Government order blanks 600 one-half grain morphine sulfate tablets and upon the date of the inspection defendant's inventory stood at 150 tablets. The prescription file required to be kept by the Government on narcotics falsely indicated that all 450 of the missing tablets had been dispensed to Mrs. Dorothy Williams. The defendant makes the contention that he was only 130 tablets short, but his computation in arriving at such a figure is falsely premised. Defendant, in his brief, assumes that Mr. Williams administered to his wife approximately two and one-half tablets per day over a period of one hundred twenty-four days between the dates of the first prescription on June 14, 1963 and the last prescription on October 19, 1963. Williams testified, and his records indicate, that he obtained morphine tablets from the defendant on eight, nine, or at most ten occasions, and he never bought more than twelve tablets at a time with the sole exception of his final purchase of thirty-six tablets, which took place after the critical inspection date. Williams originally purchased twelve tablets on June 14 and he made no additional purchase until August 31, so a period of seventy-seven days intervened, during which Williams could not have administered more than twelve tablets. The important aspect, however, is not the extent of defendant's shortage in number of tablets, but his keeping of false prescription records indicating that 450 of said tablets had been dispensed to Mrs. Williams when in fact no such amount had been so dispensed.

The defense of a suspected theft by Ruggiere is inconsistent with the prescription file records which indicated that all of the missing tablets had been dispensed to Mrs. Williams.

Additionally, Government witnesses Ruggiere and Updegraff testified to some ten separate purchases of one-half grain morphine sulfate tablets by Ruggiere from the defendant without a prescription during the period involved.

■ Defendant challenges the validity of this evidence by reason of the jury's acquittal of him on another count of the indictment charging sales to Ruggiere. We, of course, have no way of knowing whether the jury credited any part of these witnesses' testimony. Their testimony was unnecessary to a conviction on Count I. The mere fact that the jury saw fit to acquit the defendant on one count of the indictment cannot be construed as effectuating a determination of the factual issues under another count even though the same evidence is offered in support of both counts of the indictment. The Ninth Circuit observed in Bryson v. United States, 238 F.2d 657, 663 (9th Cir. 1956), cert. denied, 355 U.S. 817, 78 S.Ct. 20, 2 L.Ed.2d 34 (1957):

"A verdict on one count of an indictment cannot have the effect of determining factual issues under another count, even though the same evidence is offered in support of both counts. The legal sufficiency of the evidence to support each verdict must be determined without reference to the other. Dunn v. United States, 1932, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356."

■ Ever since the Supreme Court decision in Dunn v. United States, cited above, this Court has ruled that inconsistency of a verdict on separate counts of an indictment does not entitle a convicted defendant to reversal of a judgment of conviction. See Schaefer v. United States, 265 F.2d 750, 754–755 (8th Cir. 1959), cert. denied 361 U.S. 844, 80 S.Ct. 97, 4 L.Ed.2d 82 (1959), and cases therein cited.

Nevertheless, there was no inconsistency in the verdict in the instant case. The separate counts charged separate offenses, and we believe that the evidence was sufficient to justify a verdict of conviction under Count I without consideration of the testimony of either Ruggiere or Updegraff.

Defendant also asserts that proof was lacking in the failure to establish knowledge, willfulness, or, in effect, criminal intent. Since you cannot look into the mind of a person, intent must necessarily be inferred either from his acts or statements. The jury could have properly inferred *mens rea* from the defendant's actions in keeping the false prescription records. Evidence of wrongful intent is also corroborated by defendant's efforts to purchase Williams' records of purchases of narcotics from defendant in order to protect himself against prosecution or conviction, his admission to Agent Cox at the time of the latter's investigation of his narcotics stock and suspicion of a shortage of morphine, and his admission that he had "slipped" the doctor two extra prescriptions, but that he would never admit what could not be proven against him.

In his brief, defendant relies upon the case of Mitchell v. United States, 143 F.2d 953 (10th Cir. 1944), but we do not read this decision as giving any support to defendant's position. The court there said in a narcotics case at page 956:

> "All the government was required to do was to prove that the record was false. To illustrate: If the government proved that appellant purchased 50,000 grains of morphine and that his dispensation record showed that he [had] dispensed only 20,000 grains, it would have proved its case."

The Government made such a showing in the instant case. It proved that the defendant purchased 600 morphine tablets, had 150 on hand, and had actually legally dispensed at most only 120 of these tablets. The evidence could hardly have been more convincing, short of a confession. Since questioning the weight of the evidence, except when the testimony is incredible as a matter of law, is beyond the scope of our appellate review, we have no alternative but to hold that the evidence sustained the jury's verdict.

Defendant next asserts error on the part of the trial court in permitting Government witness Ruggiere to invoke his Fifth Amendment privilege and refuse to answer questions on cross-examination. The questions propounded were relative to two other matters wholly unrelated to Ruggiere's testimony on direct examination.

First, defendant sought to cross-examine Ruggiere respecting the details of Ruggiere's arrest on September 30, 1963 by the city police of Omaha, Nebraska. The arrest was made while the witness was an occupant of a taxicab. The query put to him by defense counsel on cross-examination was "Had you put a quantity of narcotics in that cab at the time you got in?" The witness then claimed his Fifth Amendment privilege which the trial court sustained, halting further examination into this incident. In his offer of proof, defendant asserted that the witness would have answered this question by admission of possession of narcotics which had been recently stolen from Gary's Pharmacy (another drugstore not owned by the defendant).[1]

---

1. Mr. Lathrop: (Out of hearing of the Jury) If the Court please, I would like at this time to make an offer of proof that if the witness were required to answer he would answer that he did have in his possession at the time he entered the cab a quantity of narcotics and that he had obtained them from the front lawn at 3016 North 16th Street; that after he picked the box of narcotics up, he dusted it off and got in the taxicab and that he was arrested sometime later still in the cab; that these drugs were recently stolen from Gary's Pharmacy on South 13th.

"I feel this is essential cross-examination in view of our defense that these drugs were stolen from Mike Coil, and I am entitled to show that this man not only is capable of being a drug thief but is one, and if he refuses to answer, which I guess is his privilege, we are not afforded a full, fair and complete cross-examination.

"(Offer read to the Court out of the hearing of the Jury)

"By the Court: I think I have given you great latitude. Are you objecting to the offer?

The second occasion wherein the trial court permitted the witness to invoke his Fifth Amendment privilege stemmed from questions concerning an alleged trip made on September 19, 1963 to Norfolk, Nebraska by the witness with two other drug addicts, and that while there the witness by lying, fabricating and feigning an illness induced a doctor to give him a prescription by which he obtained narcotics. The offer in proof of this second instance also shows that the testimony sought was not germane to the subject matter of the witness' direct testimony but was offered for the purpose of going to the witness' credibility.

The purpose to be served by the attempted cross-examination was to impeach the witness' credibility by showing that he would steal, burglarize or lie to obtain narcotics during a withdrawal period following a bout with the drug. Counsel had earlier elicited these self-same damaging admissions from the witness.[2]

The record indicates that the witness was under state charges based upon both the taxicab and the Norfolk, Nebraska incidents. To require him to answer defendant's questions on cross-examination would have been tantamount to forcing him to confess to two separate crimes unrelated to the subject matter of the direct testimony. This is the very evil the Fifth Amendment protects against.

Even without regard to the Fifth Amendment privilege against self-incrimination, a trial court necessarily has a great discretion on the subject of limiting cross-examination. It is only in a case of clear abuse of such discretion— one that results in obvious prejudice— that a reviewing court should interfere. Here, the testimony sought to be elicited would have been cumulative by reason of the previous general admissions of the witness which did not go so far as to link him with any particular crime. The Fifth Amendment privilege against self-incrimination protects against an answer that would furnish even a link in the chain of evidence needed to prosecute. The Supreme Court so stated in Hoffman

"Mr. Richling: We are objecting to the offer, yes.

"By the Court: Sustained.

"Mr. Richling: For the reason that counsel for defendant had laying in front of him what is obviously an Omaha Police Court record, and from this evidence that is displayed here, the proof of his facts set forth in his offer are obtainable from other sources.

"By the Court: The objection is sustained.

"Mr. Lathrop: Do I understand, then, that the witness has claimed the privilege of the Fifth Amendment concerning any of this transaction in the taxicab and that I am not to go into it?

"By the Court: That is my understanding.

"Mr. Lathrop: All right, sir." (Tr. 109–110)

2. "Q. Well, you would steal to get them, wouldn't you?

"A. Yes.

"Q. You would cheat to get narcotics, wouldn't you?

"A. Well, I would answer yes.

"Q. There is scarcely anything you wouldn't do in order to obtain narcotics?

"A. There are quite a few things I wouldn't do.

"Q. Well, you would steal, wouldn't you? You have admitted that.

"A. Yes, I would steal.

"Q. And lie?

"A. What do you mean? To whom?

"Q. To anybody who would enable you to get narcotics.

"A. I wouldn't be sitting here lying for narcotics.

"Q. I am not suggesting that. But you acknowledge that you would steal to get narcotics?

"A. Yes.

"Q. You would burglarize to get them, wouldn't you?

"A. Right.

"Q. If you would do that, you would lie to get them, wouldn't you?

"A. As I said, to whom?

"Q. Well, to anyone who might be able to supply them to you or write out a prescription for you? You would lie to them.

"A. To a doctor to try to obtain narcotics?

"Q. Yes.

"A. If I was sick?

"Q. Yes.

"A. Yes." (Tr. 98–99)

v. United States, 341 U.S. 479, 486–487, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951).

"The privilege afforded not only extends to answers that would in themselves support a conviction * * * but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute * * * if the witness, upon interposing his claim, were required to prove the hazard * * * he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result."

Accord: Malloy v. Hogan, 378 U.S. 1, 11–12, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

And the Supreme Court has also ruled that so long as a witness has not incriminated himself by what he has already answered, he may claim the privilege at any time. McCarthy v. Arndstein, 262 U.S. 355, 43 S.Ct. 562, 67 L.Ed. 1023 (1923), aff'd. on reh. 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158 (1924).

■■■ Defendant asserts that by reason of the witness' direct testimony respecting purchases of morphine tablets from the defendant, he waived his Fifth Amendment privilege. We do not agree. The witness' testimony in chief even if an admission of guilt for one crime has no relation to the other matters in which the trial court sustained the witness' right to invoke his privilege respecting separate, distinct and unrelated crimes. The Second Circuit in passing on this question adversely to defendant's contention here held in United States v. Cardillo, 316 F.2d 606, 611 (2nd Cir. 1963), cert. denied 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963):

"The district court was not in error in refusing to strike [witness'] testimony. After admitting to a substantial criminal record, [witness] invoked the privilege against self-incrimination when asked whether he committed other crimes in the past and whether he was guilty of certain crimes with which he was then charged in the state courts. These questions were purely collateral for they related solely to his credibility as a witness and had no relation to the subject matter of his direct examination. Since the trial court was aware of his substantial criminal record and the pendency of other criminal actions against him, the defendants were not prejudiced by [witness'] assertion of the privilege and, therefore, there was no need to strike his testimony."

■■■ As to whether the direct testimony of a witness invoking the privilege during cross-examination may be used against the defendant, the rule is that the testimony can be so used in cases where the cross-examination went only to collateral matters which bear on the credibility of the witness. See United States v. Cardillo, supra, at 611.

Following Cardillo, supra, this Court also noted the exception to the rule that requires striking of a witness' testimony when the cross-examination of a witness is unduly restricted. See Smith v. United States, 331 F.2d 265 (8th Cir. 1964), cert. denied 379 U.S. 824, 85 S.Ct. 49, 13 L.Ed.2d 34 (1964).

The charges pending against the witness, Ruggiere, concerning which he refused to answer questions were state charges. At the time of the Cardillo decision, there was some doubt as to whether a witness was entitled under the Fifth Amendment privilege to decline to answer when his answer would only incriminate him of charges under a state law. Such doubt has now been dispelled in favor of the witness by the Supreme Court in the recent case of Murphy v. Waterfront Comm'n. of New York Harbor, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed. 2d 678 (1964).

The witness here did not waive his Fifth Amendment privilege. The testimony sought to be elicited and rejected by the trial court concerned collateral matters going only to the witness' credibility. The evidence sought by the cross-examination was cumulative on this issue, and its exclusion was not prejudicial to defendant. The trial court properly ruled that the witness was within his rights in invoking his Fifth Amendment privilege and correctly refused to strike any of the witness' direct testimony.

The judgment of conviction is affirmed.