**UNITED STATES of America,
Appellee,**

**v.**

**Joseph LIPTON, Appellant.**

**No. 773, Docket 72–1198.**

United States Court of Appeals,
Second Circuit.

Argued May 12, 1972.

Decided Sept. 19, 1972.

Irving Anolik, New York City, for appellant.

Thomas J. Fitzpatrick, Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty., Howard Wilson and Peter F. Rient, Asst. U. S.

Attys., New York City, on the brief), for appellee.

Before FRIENDLY, Chief Judge, Mc-GOWAN * and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

Appellant Lipton appeals from a judgment of conviction entered upon a jury verdict after a five day trial in the Southern District of New York, Richard H. Levet, *District Judge,* finding him guilty of accepting a bribe as an IRS agent, in violation of 18 U.S.C. § 201(c) (1970).[1] On appeal Lipton claims error in the limitation of cross-examination of a codefendant, in the admission of hearsay evidence, in the prosecutor's reference in summation to the failure of the defense to call witnesses, and in the failure of the prosecutor to produce material claimed to be required by the Jencks Act or Brady v. Maryland, 373 U.S. 83, 87 (1963). Finding no error, we affirm.

### I.

This prosecution, like several others involving corruption among IRS agents in the New York City area, developed from evidence given to federal authorities by William Williams, a corrupt Westchester County taxpayers' representative.[2] When arrested by agents of the IRS Inspection Division on January 22, 1970, after an 18 month undercover investigation, Williams confessed to the bribing of various IRS agents and provided authorities with the names of agents involved. Lipton was one of the agents implicated by Williams. He testified as the chief government witness at Lipton's trial.[3]

The bribe here involved arose as the result of an examination by the IRS of the 1960–64 corporate tax returns of a family-owned chain of grocery and meat markets controlled by five Shallo brothers, as well as the brothers' individual returns. In June 1966, after two years of investigation, Walter Haber, the revenue agent who conducted the field audit, disallowed all deductions claimed by the corporations for purchases allegedly made for cash from wholesale suppliers on the ground that such deductions were insufficiently supported. In addition, he rejected the brothers' explanation as to the source of approximately $10,000 in their bank accounts and attributed that sum as income to the corporations and the brothers. After recomputing the corporations' and the brothers' individual returns, Haber assessed deficiencies (hereinafter, "the deficiency" or "the deficiency assessment") totalling $275,000, plus penalties of $4,000, against the corporations and the Shallos.

In August 1966, the Shallos were introduced by a mutual friend to Williams. At that time he was representing taxpayers before the IRS. The Shallos had become dissatisfied with the accountant who had represented them during the field audit. They retained Williams to represent them in administrative proceedings to reduce the deficiency assessment.

Williams first filed a protest with respect to the field audit. He claimed that the revenue agent had not allowed deductions for the wholesale purchase of produce by the corporations, but had permitted the corporations to be taxed for income derived from the retail sale of

---

* Of the United States Court of Appeals for the District of Columbia Circuit, sitting by designation.

1. Lipton also was indicted for accepting a gratuity, in violation of 18 U.S.C. § 201 (g) (1970). Pursuant to the judge's instructions, the jury did not render a verdict on the gratuity count (Count Four), since it convicted Lipton on the bribery count (Count Three). Lipton was sentenced to a one year term of imprisonment and was fined $2500.

2. For 20 years prior to his retirement in December 1965, Williams had been an IRS special agent.

3. Williams was indicted as a codefendant with Lipton. He was charged with giving Lipton a bribe (Count One) and a gratuity (Count Two) in connection with the $13,000 payment at issue here, in violation of 18 U.S.C. §§ 201(b) and (f) (1970). Prior to trial, Williams pleaded guilty to the bribery count. His case was severed.

produce. In addition, acting pursuant to IRS regulations, Williams by-passed a hearing in the conference section and filed a protest with the Appellate Division. Under this procedure the assessment made by the field agent would be reviewed by an Appellate Conferee who had authority to increase or decrease the taxpayers' deficiency assessment. Sometime thereafter, Williams was informed by the Appellate Division that Joseph Lipton, appellant herein, had been assigned as Appellate Conferee. Although Williams and Lipton had been colleagues for 8 to 10 years while Williams was with the IRS, the record does not indicate that Lipton's assignment to this case was pre-arranged by Williams or was other than fortuitous.

In January 1967, Williams first met with Lipton to discuss the Shallo case. Williams informed Lipton that the Shallos were gathering letters from their suppliers to substantiate the deductions for cash payments. There is no evidence that at this first session there was any suggestion of a bribe.

Sometime during the spring of 1967, however, Williams' efforts to reduce the deficiency shifted to illegal means. While there is a conflict between the testimony of James Shallo, the only one of the five brothers who testified, and Williams as to the details of the negotiations,[4] it is clear that by August 10, Shallo had agreed to pay a bribe of approximately $15,000 to "someone downtown in the Appellate Division". While Lipton agreed to accept this sum, it appears that Williams never divulged the corrupt agent's name to Shallo. Sometime between August 10 and August 15, Williams obtained from Shallo a paper bag containing $13,000. On the afternoon of the same day, Williams met with Lipton at a downtown restaurant and gave Lipton the $13,000.

On August 16, Lipton gave Williams a set of forms by which the IRS offered to reduce the deficiency from $279,000 to approximately $20,000, plus $4,000 in interest and penalties. On August 18, Williams returned to Lipton the forms which had been signed by the taxpayers to indicate their acceptance of the IRS offer. The reduced assessment was paid and the case was closed.[5]

Following Williams' arrest in January 1970, the indictment against him and Lipton was returned May 13, 1970. The trial of Lipton began December 7, 1971 and was concluded December 13, 1971 when the jury found Lipton guilty on the bribery count. Lipton did not testify at his trial and did not present any evidence. He was sentenced January 14, 1972 and has been enlarged on bail pending appeal.

4. Shallo testified that in the spring of 1967 Williams told him that he could "take care of [the deficiency] with someone downtown in the Appellate Division" for $5,000 and that the deficiency would be reduced to "practically nothing". When Shallo said that he wanted to "go through the courts and fight it out in the open", Williams estimated that the legal costs would be $50,000 to $60,000. Sometime in July, Williams returned and told Shallo that the amount required to fix the case had increased to $15,000–$18,000. Shallo indicated a willingness to pay a bribe but objected to the amount. After Williams made a phone call, he told Shallo that for $13,000 the deficiency would be reduced to practically nothing. To this Shallo agreed.

Williams testified, on the other hand, that Lipton had initiated the bribe attempt in May 1967 when he offered to reduce the assessment from $279,000 to $25,000 in return for a payment to Lipton of $25,000, or approximately 10% of the savings. Williams told Lipton that the Shallos could not afford such a large sum. Lipton insisted that such sum was required because he "had to take care of somebody on the inside". After several meetings in June, July and August, Lipton agreed to accept $15,000, a figure to which Shallo, after meeting with Williams, also agreed.

5. The 1960–64 returns of the corporations and the Shallos were reopened as a result of Williams' disclosures and again were being audited at the time of the trial of this case.

## II.

Lipton contends that the district judge unduly limited his trial counsel's scope of cross-examination of Williams.[6] We disagree. Our careful examination of the entire record leaves us with the firm conviction that Lipton's counsel was given ample opportunity to cross-examine Williams and that Judge Levet's rulings were well within his discretion as the trial judge.

Brief reference to certain of the testimony preceding the cross-examination of Williams will place in context Lipton's claim that his cross of Williams was unduly curtailed.

James Shallo, the government's first witness, testified on direct regarding the amount of the deficiency assessment and the payment of the bribe.[7] On cross, Shallo admitted that Williams never named Lipton as the corrupt agent, that he never met Lipton and that he did not see Williams give the $13,000 to Lipton.

The government next called Williams. On direct, he testified to his version of the bribe negotiations[8] and the reduction of the deficiency assessment from $279,000 to $24,000. He further testified that for his services the Shallos paid him a fee of $3500—one $500 check, a second $1,000 check, and $2,000 in cash. He insisted that this fee constituted the sole payment to him in the case, and that the full $13,000 from the Shallos was given to Lipton. On cross, defense counsel sought to establish that Williams retained the $13,000.

It was at this point that the first challenged ruling was made. Defense counsel asked Williams if the cash "you received from James Shallo was not paid to Mr. Lipton but was retained by you?" Williams answered in the negative, volunteering that he would not lie because it would subject him to a charge of perjury. Defense counsel then asked him who would decide whether a perjury charge was to be brought. The government objected. Judge Levet sustained the objection as to form and relevancy.[9]

Lipton contends that the judge erred in sustaining the objection. He argues that the jury could have inferred from Williams' answer that he might seek to ingratiate himself with the federal authorities in the hope of leniency, in the six pending bribery cases in which he had pleaded guilty, by testifying falsely against Lipton without risk of prosecution for perjury.

We appreciate the force of Lipton's argument that with a witness such as Williams considerable latitude on cross should be permitted to show motive, bias and interest. And we note that the government with commendable candor concedes, Government Brief 7, that "the answer might have added support for the argument that Williams was beholden to the Government". But we completely agree with the government's further ob-

---

6. Lipton was represented at trial by counsel other than his counsel on this appeal.

7. Note 4, *supra.*

8. Note 4, *supra.*

9. The following is the testimony and colloquy immediately preceding the ruling in question:

 "Q. Mr. Williams, isn't it a fact that the cash which you received from James Shallo was not paid to Mr. Lipton but was retained by you?

 A. Definitely not. I, certainly at this stage of the game, wouldn't get up here and perjure myself. I'm in enough trouble as it is without having a perjury rap on top of a bribery rap.

 Q. Who would make that determination, Mr. Williams?

 The Court: Who would make what determination?

 Mr. Fitzpatrick: [Asst. U.S. Atty.] Objection.

 Q. About a perjury rap.

 Mr. Fitzpatrick: I object to the form of the question, Your honor.

 The Court: Sustained, not merely to the form, but because it is irrelevant.

 Q. Did an inspector ever say to you, Mr. Williams, that if he believed you weren't telling the truth, he would cause you to be prosecuted for perjury?

 Mr. Fitzpatrick: I object to that, Your honor.

 The Court: Sustained."

servation that "Lipton had already made this point ad nauseum". *Id.* Cross-examination of Williams covers 68 pages of the trial transcript—more than a quarter of the total testimony. Lipton's counsel established over and over again Williams' interest and motive in cooperating with the government. To have permitted him to testify in substance that it was the United States Attorney who would determine whether he should be prosecuted for perjury, all else aside, would at best have been cumulative on the issue of bias. See United States v. Russo, 442 F.2d 498, 503 (2 Cir. 1971), cert. denied, 404 U.S. 1023 (1972); cf. United States v. Campbell, 426 F.2d 547 (2 Cir. 1970). In a slightly different context (withholding a portion of an IRS report claimed to be relevant on the issue of the motive and bias of a government witness), Judge Hays in *Campbell* stated the criteria for the trial judge's exercise of discretion as follows:

> "In determining whether the trial judge has abused his discretion in limiting the introduction of such [impeaching] evidence, the issue is whether the jury was otherwise in possession of sufficient information concerning formative events to make a 'discriminating appraisal' of a witness' motives and bias." 426 F.2d at 550.

We hold here that the jury was otherwise in possession of more than sufficient information on the issue with respect to which it is claimed the excluded testimony would have been relevant.[10]

■ The next challenged ruling on cross of Williams is that the judge sustained an objection to a question as to whether Williams had told an IRS inspector two years earlier that the audit in the Shallo case was "ridiculous". The judge, in sustaining the government's objection, stated that "[i]t doesn't in any way impeach his testimony, nor does it refresh his testimony or anything else". We agree.

This line of cross was directed at Williams' initial protest with respect to the field audit based on the claim, referred to above, that the revenue agent had not allowed deductions for the wholesale purchases of produce by the corporations but had permitted the corporations to be taxed for income derived from the retail sale of produce. Defense counsel had already cross-examined Williams at considerable length to establish that the revenue agent disallowed all wholesale cash purchases of produce. Elsewhere on cross, counsel had established that Williams based his protest on the inconsistency in the agent's refusal to allow sufficient cash purchases to create the volume of sales on which he based the corporations' taxable income.[11]

In the light of this previous testimony by Williams on cross regarding errors allegedly made in the field audit, the exclusion of his characterization of the audit as "ridiculous", even if relevant, surely would have had little if any additional impact on the jury. We hold that the judge's ruling was well within his discretion in determining the proper scope of cross-examination.

Lipton's final challenge to the judge's rulings on Williams' cross-examination is an argument—asserted on appeal for the first time in appellant's reply brief—

---

10. Lipton also contends that the judge improperly limited his attempts to establish Williams' bias by asking him whether he had accused other agents of accepting bribes. This claim is wholly without merit. Aside from the fact that the government's objections and the judge's rulings were addressed only to the form of the questions, the record shows that this information was fully developed in subsequent questioning.

11. "A. [Williams]: I caused a protest to be filed based on the fact that the

revenue agent hadn't allowed any cash purchases for produce, and if they had sales, they had to have purchases.

\* \* \*

Q. [W]ere the totals of cash purchases you computed greater than the purchases allowed by the revenue agent in his examination?

A. The total of cash purchases as represented by the letters that were sent out and returned by the suppliers was greater; yes."

that the judge erred in sustaining Williams' claim of privilege against self-incrimination with respect to "matters not pertaining to this indictment."

■ Williams claimed this privilege on cross-examination regarding the amount of the fee he received from the Shallos. Williams had testified, as indicated above, that he received a total fee of $3500: $1,500 in checks and $2,000 in cash. He conceded, however, that he may have told agents of the IRS Inspection Division that he received only $1,500 in cash. Defense counsel then asked Williams if he reported the cash as income. In response to this question, Williams claimed his Fifth Amendment privilege. The judge sustained the claim, stating that "You have a right to raise the Fifth Amendment here as to matters not pertaining to this indictment." We agree.

■ We fail to see any probative value to Lipton's defense in Williams' answer to this question, had he been directed to answer. Clearly, it is unrelated to the issue for which it is claimed by Lipton's counsel on appeal, namely, whether Williams passed on to Lipton the $13,000 given him by James Shallo.[12] At most, it may be said to relate to Williams' credibility. But, as we have held above, the issue of Williams' credibility was exhaustively covered by defense counsel. We therefore hold that there was no error in the judge's excluding

Williams' answer to the question, "Did you report the cash as income?" This related to a collateral matter bearing at most on the credibility of the witness. Even if relevant, the answer would have been cumulative.[13]

### III.

Lipton next contends that the district judge erred in allowing in evidence the alleged hearsay testimony of Lawrence Ruggiero, an IRS agent, that in December 1968 and in September 1969 Williams admitted that he had paid a bribe to Lipton on the Shallo case. This claim is without merit.

Defense counsel on cross-examination of Williams asked whether he had ever told certain people prior to his arrest that he had paid off Lipton. Williams replied in the negative. Defense counsel pressed the matter further and obtained an admission from Williams that he had mentioned the pay-off to Ruggiero. The government then called Ruggiero as a witness. He testified that, while posing as a corrupt IRS agent during the investigation of Williams, the latter discussed with Ruggiero other IRS agents who had accepted bribes and who could be consulted on deals. During the course of these conversations, Williams told Ruggiero about the bribe he had paid to Lipton on the Shallo case.

■ At the outset, we note that Lipton did not object at trial to the admis-

---

12. Lipton's counsel erroneously contends that this line of cross-examination related to the $13,000 bribe money. As we read the trial transcript, the reference is to the cash—$1500 or $2000—paid as part of Williams' fee of $3500.

13. Lipton claims that Williams, by testifying as a government witness, waived his privilege against self-incrimination, specifically with respect to questions regarding his own income tax returns. Appellant's heavy reliance on Brown v. United States, 356 U.S. 148 (1958), is misplaced. *Brown* involved a contempt conviction of a *party* to the suit who, having taken the stand on her own behalf, refused to answer questions on cross-examination. The decision does not stand for the proposition for which it is cited

by appellant, namely, that a *witness*, by giving testimony, waives his privilege against self-incrimination as to any and all questions asked on cross-examination. The Supreme Court specifically held that its decision was not that broad. 356 U.S. at 155-57. See Hett v. United States, 353 F.2d 761, 764 (9 Cir. 1965), cert. denied, 384 U.S. 905 (1966); United States v. Coil, 343 F.2d 573, 579-80 (8 Cir.), cert. denied, 382 U.S. 821 (1965); Smith v. United States, 331 F.2d 265, 276-78 (8 Cir.), cert. denied, 379 U.S. 824 (1964); United States v. Lawrenson, 315 F.2d 612, 613 (4 Cir.), cert. denied, 373 U.S. 938 (1963); United States v. Cardillo, 316 F.2d 606, 611 (2 Cir.), cert. denied, 375 U.S. 822 (1963).

sion of Ruggiero's testimony as hearsay; indeed, he conceded that it was admissible as a prior consistent statement by Williams. It is true that Lipton's trial counsel did interpose a general objection to the admission of Ruggiero's conversation with Williams, which objection was promptly overruled; but of course this was insufficient to preserve for appeal the presently asserted hearsay claim. Moreover, Lipton did not request the instructions which he now claims should have been given; nor did he object to the judge's charge on the subject. Under these circumstances, the short answer to Lipton's claim is that he is precluded from raising it for the first time on appeal, since it was not plain error. United States v. Indiviglio, 352 F.2d 276, 279–80 (2 Cir. 1965) (en banc), cert. denied, 383 U.S. 907 (1966), and many other cases to the same effect.

 Even if a proper objection at trial had been made, however, we would find no error in the admission of Ruggiero's testimony. It was admitted for the limited purpose of rehabilitating Williams by showing that, at a time when he had no motive to lie, he made statements consistent with his testimony at trial. 4 Wigmore, Evidence § 1128, at 203 (3d ed. 1940). The testimony was admitted, not for the truth of the matter asserted, but simply to show that prior consistent statements were made. United States v. DeLaMotte, 434 F.2d 289, 293 (2 Cir. 1970), cert. denied, 401 U.S. 921 (1971); United States v. DiLorenzo, 429 F.2d 216, 220 (2 Cir. 1970), cert. denied, 402 U.S. 950 (1971); United States v. Grunewald, 233 F.2d 556, 566 (2 Cir. 1956), rev'd on other grounds,

353 U.S. 391 (1957). Moreover, the judge's instruction to the jury,[14] made without objection by defense counsel, adequately informed it of the limited purpose of such testimony. United States v. DiLorenzo, *supra*, 429 F.2d at 220.

## IV.

 Lipton further contends that his privilege of not testifying was violated by the prosecutor's comment in summation upon the failure of the defense to call witnesses to support its theory that agent Haber had maliciously inflated the field audit.[15] This claim is without merit for several reasons.

 First, we have held that the prosecutor may comment upon the defense's failure to call witnesses to contradict the government's case. United States ex rel. Leak v. Follette, 418 F.2d 1266, 1268–70 (2 Cir. 1969), cert. denied, 397 U.S. 1050 (1970). Nor does this case fall within the exceptions to that rule where, for example, the defendant alone has the information to contradict the government's case, *Leak, supra,* 418 F.2d at 1269–70, or where the jury will "naturally and necessarily" interpret the summation to be a comment upon the defendant's silence, *Leak, supra,* 418 F.2d at 1269; United States ex rel. D'Ambrosio v. Fay, 349 F.2d 957, 961 (2 Cir.), cert. denied, 382 U.S. 921 (1965). Here, the prosecutor specifically referred to the failure of the defense to call Haber or Ragni, without any reference to Lipton's failure to testify himself.

Second, the remark by the prosecutor here in question was fair rejoinder to de-

14. Judge Levet charged the jury on this matter as follows:
"If you find that the statements by Mr. Williams were also made at a time prior to which a suggested motive would have arisen, particularly here before the arrest, then you may consider these prior statements by Mr. Williams on the question of whether or not he really had any motive to lie in this case."

15. The prosecutor's statement in summation was as follows:

"From little bits and pieces of evidence Mr. Kantor has conjured up this story about a raw deal by Mr. Haber. Can you believe that? If Mr. Haber's report was unfair, why didn't Mr. Kantor call Mr. Haber and prove it to you? Why didn't he call Mr. Ragni [the Shallos' accountant] and say, 'I didn't like Haber. He was no good. He was unfair.' Why wasn't there some evidence of this?
Because it is all speculation. How much do we know—"

fense counsel's argument in summation that:

"[T]here is testimony in this record that Mr. Ragni and Mr. Haber didn't get along. I think the phrases were that Mr. Ragni wouldn't cooperate in the course of the examination. The result was a whopping deficiency assessment."

We have so held. United States v. Tortora, 464 F.2d 1202, 1207 (2 Cir. 1972); United States v. Leeds, 457 F.2d 857, 860 (2 Cir. 1972); United States ex rel. Leak v. Follette, *supra*, 418 F.2d at 1269–70; United States v. Mattio, 388 F.2d 368, 371 (2 Cir.), cert. denied, 390 U.S. 1043 (1968); United States v. Feinberg, 140 F.2d 592, 595 (2 Cir.), cert. denied, 322 U.S. 726 (1944).

Finally, the instruction given by Judge Levet immediately after the statement in question,[16] to which defense counsel did not object, cured any prejudice to Lipton. *Cf.* United States v. Briggs, 457 F.2d 908, 911–12 (2 Cir. 1972).

### V.

Lipton's final contention is that the district judge erred in failing to direct the government to produce certain material required by the Jencks Act, 18 U.S.C. § 3500 (1970), or Brady v. Maryland, 373 U.S. 83, 87 (1963). We reject this contention as frivolous.

At the conclusion of the direct examination of the witness Ruggiero, the government produced, in compliance with the Jencks Act, portions of a transcript of tape recordings of conversations, see page 1167, *supra*, between Ruggiero and Williams on December 19, 1968 and September 10, 1969 relating to Lipton.[17] After Lipton's counsel cross-examined Ruggiero concerning these documents, they were offered as full exhibits by Lipton's counsel and were allowed in evidence by the judge. After reviewing these documents, moreover, and at the request of Lipton's counsel, the judge ruled that they should have been produced while Williams was on the stand. The judge therefore ordered the government to produce Williams the next day for further cross-examination by Lipton's counsel. When court resumed the next day, however, defense counsel stated that "I [have] reviewed all of the circumstances" and "I withdraw my request for the production of Mr. Williams."

Aside from the two documents referred to above, defense counsel brought out on his cross-examination of Ruggiero that he had had about 60 recorded conversations with Williams during the 18 month undercover investigation of Williams while Ruggiero was posing as a corrupt agent; that Williams had told Ruggiero about 40 corrupt IRS personnel; and that Williams had said he never held back bribe money from an agent with whom he was dealing. Regarding the latter, defense counsel and, at his request, the judge asked Ruggiero whether that conversation had been recorded; he responded that "[i]t may have been recorded or it may have been the first time that I met him". Defense counsel then asked the prosecutor "whether there is a record of that conversation", to which the prosecutor responded, "I don't know, Your Honor." This subject was never thereafter pursued by defense counsel. At no time did he ever ask that a record of such conversation, if there was one, be produced.

Under these circumstances, we hold that there is no basis in this record for Lipton's claim on appeal that his rights under the Jencks Act or under *Brady* were violated. There was nothing whatsoever in the direct examination of either Williams or Ruggiero which touched upon alleged corruption of

---

16. Judge Levet instructed the jury on this matter as follows:

"Of course, I think it is fair to say at this time that the defendant is not required to call any witnesses, Mr. Fitzpatrick."

17. The two documents produced were immediately marked government exhibits 3508 and 3509 for identification and later as defendant's exhibits D and E in evidence.

agents other than Lipton. The judge permitted a broad scope of cross-examination of Ruggiero on the basis of the § 3500 material produced and on the issue of whether any other § 3500 material existed. Lipton expressly withdrew his request that Williams be recalled for further cross in the light of exhibits D and E in evidence. With respect to the possible existence of the only other recorded conversation about which defense counsel inquired, his failure to demand its production or otherwise to pursue the matter in the trial court precludes his claiming error with respect thereto on appeal. Finally, for aught that appears before us, any record, if there were one, of a conversation in which Williams said he never held back bribe money from an agent can hardly be said to qualify as "evidence favorable to [the] accused". *Brady, supra,* 373 U.S. at 87.

We have considered Lipton's other claims and find them without merit.

Affirmed.