**In the Interest of J.D.S., A Child, Appellant,**

**State of Iowa, Appellee.**

**No. 88–757.**

Supreme Court of Iowa.

Feb. 22, 1989.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., and Katherine S. Miller–Todd, Asst. Atty. Gen., for appellee.

SNELL, Justice.

This appeal arises from an adjudication that the sixteen-year-old child in interest, J.D.S. ("Jay"), committed a delinquent act by sexually abusing a four-year-old boy, B.M. ("Brad"). *See* Iowa Code §§ 232.-2(12)(a) ("delinquent act" defined), and 709.1 and 709.3(2) (second-degree sexual abuse defined). Our review is de novo. Iowa Code § 232.58 (1987); *In re Meek*, 236 N.W.2d 284, 289 (Iowa 1975). We give weight to the fact findings of the juvenile court, especially when considering the credibility of the witnesses, but are not bound by them. Iowa R.App.P. 14(f)(7); *In re Meek*, 236 N.W.2d at 289. We affirm.

The investigation in this case commenced on July 18, 1987, when C.M., Brad's mother, observed Brad place his fingers on and then lick the bottom of his three-year-old brother. This occurred while the two boys were bathing. On July 21, C.M. reported the incident to the supervisor of the day care center where she worked and which Brad attended; the supervisor, in turn, reported it to Lou Ann Pumphrey, a child abuse investigator for the State. On July 22, Ms. Pumphrey interviewed Brad for the first time. In the course of this interview, Brad told her he had gotten the idea to lick his brother's bottom from Sheryl, his day care teacher. He also denied having had anybody lick or touch his bottom, but stated that he had seen two other children from day care do what he did to his brother. Prior to this interview, however, Brad told his mother he did not want to go swimming at the YMCA because he was afraid of Jay, a teacher's aide at the day care center. He also told her that Jay had licked his bottom and put a finger in his bottom.

On July 28, 1987, Ms. Pumphrey again interviewed Brad. Also present and interviewing Brad on this occasion was Sandy Parisho, a sexual abuse investigator with

Jon M. Kinnamon, Cedar Rapids, and Valorie K. Wilson, Des Moines, for appellant.

the Des Moines Police Department. During this interview, Brad stated that Jay had licked his bottom at the YMCA when Brad was putting his clothes on after swimming. Jay was responsible for supervising the day care center boys in the dressing room at the YMCA. Brad again denied being touched anyplace by anyone, including Jay.

On August 3, 1987, Brad was examined by Dr. Rizwan Shah, a medical doctor employed as Director of the Child Sexual Assault Diagnostic Clinic at Broadlawns Medical Center in Des Moines. Before the examination, Brad was briefly interviewed by Shirley Keenan–Allen, Dr. Shah's medical assistant, and told her that Jay had touched his bottom with his hand on one occasion. Brad correctly identified the anal area on an anatomically correct doll as the "bottom." Dr. Shah's examination revealed some venous pooling, a collection of blood in a dilated vein just underneath the skin, in Brad's anal area. In her opinion, this condition indicated Brad had sustained an assault to his anus that was consistent with finger insertion and inconsistent with Brad's initial denials of physical contact. Dr. Shah found no evidence to suggest an object larger than a finger had been inserted. Her best guess regarding the age of the injury, based upon the extent of the trauma and Brad's age, was that it was four to six weeks old, but she did not believe there was any way to arrive at an absolute age for a venous pooling injury. Brad's mother thought the assault took place on July 16, 1987, when Brad had last gone swimming at the YMCA, two and a half weeks before Dr. Shah's examination.

This action was subsequently commenced in Polk County Juvenile Court on October 19, 1987, by the filing of a petition alleging Jay had committed four delinquent acts: three thefts and sexually abusing a minor. He admitted committing one of the thefts and the other two theft allegations were dismissed. An adjudicatory hearing was held only on the sexual abuse allegation, resulting in the juvenile court's determination beyond a reasonable doubt that Jay sexually abused Brad in violation of Iowa Code §§ 709.1 and 709.3 (1987). Jay was therefore adjudicated to have committed a delinquent act as defined in Iowa Code § 232.2(12)(a) (1987). This matter was then transferred to the Linn County Juvenile Court for disposition because Jay and his mother made their home in Cedar Rapids. Placement of Jay was ordered continued at a group home facility in Waverly, with the additional requirement that Jay receive group specific therapy in a sex offenders' program in Waterloo.

I. *Right of Confrontation.* Jay's first contention on appeal of this disposition and the sexual abuse adjudication is that he was denied the right to confront witnesses against him at the adjudicatory hearing (1) by the implementation of a screening procedure that enabled Brad to testify without being able to see Jay, and (2) by Brad's alleged refusal to respond to cross-examination.

We note at the outset that juvenile delinquency proceedings are not criminal prosecutions; they are special proceedings that serve as an ameliorative alternative to the criminal prosecution of children. *In re Johnson,* 257 N.W.2d 47, 48 (Iowa 1977); *State v. White,* 223 N.W.2d 173, 175 (Iowa 1974). The non-criminal nature of these proceedings, however, does not deprive the child in interest of all constitutional procedural rights. Although the child is not entitled to a jury trial, *McKeiver v. Pennsylvania,* 403 U.S. 528, 545, 91 S.Ct.1976, 1986, 29 L.Ed.2d 647, 661 (1971), he or she is entitled to several other due process rights, including the right to confront and cross-examine adverse witnesses. *In re Johnson,* 257 N.W.2d at 49; *In re Delaney,* 185 N.W.2d 726, 729 (Iowa 1971).

A. *Screening Procedure.* Jay asserts his right to confront witnesses against him was violated by the taking of Brad's testimony in a room separate from him, pursuant to Iowa Code section 910A.14(1) (1987). That section states:

1. A court may, upon its own motion or upon motion of any party, order that the testimony of a child, as defined in section 702.5, be taken in a room other than the courtroom and be televised by closed circuit equipment in the courtroom

to be viewed by the court. Only the judge, parties, counsel, persons necessary to operate the equipment, and any person whose presence, in the opinion of the court, would contribute to the welfare and well-being of the child may be present in the room with the child during the child's testimony.

The court may require a party be confined to an adjacent room or behind a screen or mirror that permits the party to see and hear the child during the child's testimony, but does not allow the child to see or hear the party. However, if a party is so confined, the court shall take measures to insure that the party and counsel can confer during the testimony and shall inform the child that the party can see and hear the child during testimony.

Iowa Code § 910A.14(1) (1987). By the use of a one-way mirror, Jay was able to observe Brad but Brad could not see Jay.

█ Our determination of the constitutionality of denying Jay a face-to-face confrontation with Brad is guided by *Coy v. Iowa,* 487 U.S. ——, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). Coy was charged with sexually assaulting two thirteen-year-old girls while they were camping out in the backyard of the house next door to him. The procedure used by the trial court was to place a large screen between him and the witness stand during the girls' testimony. The screen enabled the defendant to see the victim witnesses but they could not see him at all. The United States Supreme Court held that this screening procedure violated the defendant's constitutional right to a face-to-face confrontation guaranteed under the Sixth Amendment, absent individualized findings that these thirteen-year-old witnesses needed special protection while testifying. *Coy,* 487 U.S. at ——, 108 S.Ct. at 2803, 101 L.Ed.2d at 867. The generalized import of section 910A.14 to protect child victims was insufficient to withstand Coy's constitutional challenge as it affected him. *Id.* On remand our court held it could not find that the error involving Coy's constitutional rights was harmless beyond a reasonable doubt. Accordingly, the case was reversed and remanded

for a new trial. *State v. Coy,* 433 N.W.2d 714, 715 (Iowa 1988).

In conceptualizing the protection afforded by the Confrontation Clause, the Supreme Court emphasized the importance of a defendant's right to physically face those who testify against him. Even so, the Court found that the Confrontation Clause does not compel a witness to fix his eyes upon the defendant. *Coy,* 487 U.S. at ——, 108 S.Ct. at 2802, 101 L.Ed.2d at 866. He may studiously look elsewhere, but the trier of fact will draw its own conclusions. The Court further confirmed that the rights conferred by the Confrontation Clause are not absolute, and may give way to other important interests. *Id.*

The Court reserved judgment, however, on whether any exceptions exist to the right of face-to-face confrontation, stating "[w]hatever they may be, they would surely be allowed only when necessary to further an important public policy." *Id.* at ——, 108 S.Ct. at 2803, 101 L.Ed.2d at 867. Justice O'Connor, joined by Justice White, expanded on this thought in her concurring opinion:

The protection of child witnesses is, in my view and in the view of a substantial majority of the States, just such a policy. The primary focus therefore likely will be on the necessity prong. I agree with the Court that more than the type of generalized legislative finding of necessity present here is required. But if a court makes a case-specific finding of necessity, as is required by a number of state statutes, our cases suggest that the strictures of the Confrontation Clause may give way to the compelling state interest of protecting child witnesses. Because nothing in the Court's opinion conflicts with this approach and this conclusion, I join it.

*Id.* at ——, 108 S.Ct. at 2805, 101 L.Ed.2d at 869–70 (O'Connor, J., concurring) (citations omitted).

In the present case, Jay's counsel resisted the State's motion for a protective order as violating the defendant's right "to be confronted with the witnesses against

him." Counsel cited the Sixth and Fourteenth amendments to the United States Constitution and article I, section 10 of the Iowa Constitution. Both constitutions contain the same wording. Counsel applied for an order allowing an independent evaluation of Brad to be paid by the court. The application was granted and an evaluation made. Thereafter a full hearing was conducted on whether a protective order would be issued.

At the hearing a letter was introduced from Cindy McClary, a clinical social worker at Des Moines Child Guidance Center, Inc., who had been Brad's therapist for two months. She stated he had verbalized his fear of Jay and was very angry at Jay for hurting him. On five separate occasions Brad mentioned that Jay had sexually abused him and made it clear during each session that he did not want to have any access to Jay. These occasions were during the initial family interview, and during his fourth, fifth, seventh and eighth week of therapy. McClary highly recommended that Brad not have to confront Jay nor should he be in the direct vicinity of Jay for appointments, court appearances, etc. She concluded that Brad verbalized quite strongly that Jay sexually abused him and that it would not be in his best interest to have any contact with Jay.

Jay's counsel submitted a letter at the hearing from Shahe E. Zenian, a clinical psychologist at Broadlawns Medical Center. His examination consisted of a forty-five minute interview with Brad's mother alone, a five-minute conference with Brad's father, and a little over a half hour interview with Brad in the presence of his mother. His opinion was that Brad would not be traumatized if he were to testify face-to-face against Jay in a courtroom setting. The guardian ad litem representing Brad joined with the State in seeking a protective order.

Following oral arguments and the submission of written briefs by the parties, Judge Harry Perkins sustained the State's motion. In so doing the juvenile court adopted for its reasons the arguments urged by the State that Brad would be traumatized by a confrontation with Jay. The State emphasized the fears and anger of Brad and this four-year-old's desire to have no contact with Jay, who at age sixteen was 6'1" tall and weighed 248 pounds. The court also stated that the report of Cindy McClary was more credible that that of Shahe Zenian. This was not because Zenian was not a qualified therapist. The court stated he was personally acquainted with Zenian and he was qualified. The reason was because he had not had the opportunity, in his limited observation of the child, to see and know as much as Cindy McClary had. The juvenile court ordered the protective screen to be the least obtrusive, consistent with the purposes of the statute. What that would be was left to the judge who would try the case.

At trial, Judge Vincent M. Hanrahan decided that the protection would be provided by taking Brad's testimony at the juvenile court offices in a room containing a one-way mirror. The room, in which nine people were present, was 6'9½" wide and 12'1½" long. Jay was in an adjoining room where he was able to hear and see Brad through the one-way mirror. Brad was told by the court that Jay was on the other side of the mirror, that he could see and hear Brad, but that he was going to stay in the other room.

At the outset Jay's counsel asked the court to determine the competency of Brad before the State questioned him. The court then engaged Brad in the following colloquy:

Q. Brad, you are four years old, are you?

A. I am four years old.

Q. Do you go to school?

A. No. I go to day care.

Q. Day care. Will you go to school next year maybe?

A. Sure.

Q. That a boy. And you go to Sunday school?

A. No.

Q. Do you go to church?

A. No.

Q. What do you do all day?

A. I stay at home.

Q. You stay at home?

A. I stay at home.

Q. Do you know what it means to tell the truth, Brad?

A. If you can.

Q. If you can?

A. If you can, you have to.

THE COURT: What did he say?

Q. I didn't understand what you said, Brad.

A. You don't have to say it, Tom.

Q. Hey, do you know what it is to tell a lie?

A. You mean, if you tell a lie, you have to get in big trouble.

Q. You are in big trouble. Do you know the difference between the truth and a lie?

A. The truth means if you can, you have to.

Q. I am sorry, I didn't understand what you said, Brad.

A. The truth means if you can, you have to tell the truth, but—to the judge.

Q. You have to tell the truth to the judge?

A. (Witness nods head affirmatively.)

Q. Will you tell the judge any lies?

A. No.

Q. Do you know what a lie is?

A. Yeah.

Q. What is a lie?

A. Meaning you are in—you are in big trouble.

Q. It means you are in big trouble. So when you tell us some things here today, you are going to tell us the truth?

A. Yeah.

Q. You are not going to tell us any lies, are you?

A. No. He put a finger in my bottom and then he started to—I am going to tell my dad.

Thereupon the court told Brad that the county attorney was going to ask him some questions.

Jay's counsel objected generally and specifically to all aspects of this screening procedure. Although Jay was not in the same room, at no time did Jay's counsel request to consult with Jay during Brad's testimony. Nor does the record reflect that Jay attempted to consult with his counsel at that time. We find nothing that would have prevented or impeded their consultation.

By enacting chapter 910A, the Victim and Witness Protection Act, the legislature evinced its belief that protection of child witnesses is an important public policy. The trial court found and, by our de novo review, we agree that the screening procedure employed in this case was necessary to protect Brad and comported with the statutory purpose. We also find the procedure to be reasonable and hold that it did not violate Jay's right of confrontation under the federal or Iowa constitutions.

■ We also hold that Jay's due process rights were not violated by failing to place Brad under oath, as required by Iowa Rule of Evidence 603. The record demonstrates the juvenile court thoroughly questioned Brad to ascertain his ability to distinguish between telling the truth and lying and impressed upon him his duty to tell the truth. We are convinced the court accomplished its goal and that Brad was a competent witness. It would have been superfluous to have had this four-year-old participate in a rote recitation of the oath.

B. *Cross-Examination.* After Brad's testimony, Jay's counsel moved for a mistrial and moved to strike all of Brad's testimony because of his alleged refusal to submit to cross-examination. The court overruled the motion for mistrial and took the motion to strike under advisement. When the State rested its case, Jay's counsel renewed her motion to strike. Although the court did not explicitly rule on this motion, it is undisputed the court's adjudication order reveals it considered all the evidence presented, including Brad's testimony.

■ There is no doubt Jay's counsel experienced difficulties cross-examining Brad, particularly when asking him to remember adults who had previously questioned him but who he had met only a few times, including Lou Ann Pumphrey and Sandy Parisho. Brad had no trouble answering

questions about people he knew, particularly Jason and Brandon, who also attended the day care center. More importantly, Brad readily answered nearly all of the questions of Jay's counsel that related to the alleged abuse. When asked "Bradley, you say that Jay put his finger in your bottom, is that right?" Brad stated "Yes." When asked "And you say that he kissed your bottom, is that right?" Brad again stated "Yes." When asked "Where were you when Jay touched you?" Brad answered "At the Y." When asked "When Jay touched your bottom, who else was there?" Brad answered "Nobody." And when asked "Do you know why Jay touched your bottom?" Brad stated "No."

The follow-up to the last question was the only question relating to the abuse incident that Brad refused to answer. When asked "Did Jay say anything to you when he touched your bottom?" Brad said "I don't know your question is. I don't want to talk about it." Jay's counsel did not attempt to ask this question again, although such persistence had repeatedly been successful earlier in the cross-examination. Nor was Brad otherwise questioned about a statement by his mother that he had said "Jay was looking for poop."

We have previously stated in the context of a criminal proceeding:

> The general rule is that where the witness after his examination in chief on the stand has refused to submit to cross-examination, the opportunity of thus probing and testing his statements has substantially failed and his direct testimony should be struck out. But to this general rule there are many exceptions. One is that on the circumstances of the case, the refusal or evasion of answers to one or more questions only need not lead to this result.

*State v. Davis,* 236 Iowa 740, 747, 19 N.W.2d 655, 658 (1945) (quoting *Stephan v. United States,* 133 F.2d 87, 97 (6th Cir. 1943)). Also instructive is the analysis of the federal courts in cases where a prosecution witness refuses to answer cross-examination questions in order to avoid self-incrimination:

> [T]here are three categories of testimony which require different action by the trial court when there is a refusal to submit to cross-examination. If the answer sought would have been so closely related to the crime for which the defendants were being tried, that the defendants may be substantially prejudiced by being deprived of their right to test the truth of the witness' direct testimony, the entire testimony of the witness should be stricken. If the subject matter of the testimony is connected with only a part, but not all, of the case being tried, a partial striking of the witness' testimony might suffice. The third category consists of testimony involved in collateral matters or cumulative testimony concerning credibility. The refusal of a witness to submit to cross-examination on such matters as these does not require that any testimony be stricken, but can be handled by a charge to the jury.

*United States v. Stephens,* 492 F.2d 1367, 1374–75 (6th Cir.1974) (citing *United States v. Cardillo,* 316 F.2d 606 (2d Cir.), *cert. denied,* 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed. 2d 55 (1963)). *See also United States v. Rogers,* 475 F.2d 821, 827 (7th Cir.1973); *Coil v. United States,* 343 F.2d 573, 579 (8th Cir.1965). The foregoing analyses are applied in light of the recognition that the Constitution "guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674, 683 (1986).

Our review of the cross-examination of Brad persuades us Jay was given an opportunity for effective cross-examination. Brad responded to virtually all of the questions of Jay's counsel. On occasion, Brad's responses were not elicited until the questions had been repeated once or twice, but that did not prejudice Jay as the questions were finally answered. Moreover, the questions Brad did not ultimately answer were not so closely tied to the sexual abuse allegation that Jay was deprived of his right to test the truth of Brad's direct testimony. We therefore uphold the juve-

nile court's decision to not strike Brad's testimony.

II. *Sufficiency of Evidence.* Jay contends the evidence adduced by the State was insufficient to show beyond a reasonable doubt he performed a delinquent act, as required by Iowa Code section 232.47(10) (1987). *See In re Thompson,* 241 N.W.2d 2, 4 (Iowa 1976); *In re Wheeler,* 229 N.W. 2d 241, 243 (Iowa 1975). As part of his challenge to the sufficiency of the evidence, he also contends the insertion of a finger into an anus does not constitute a "sex act," as defined by Iowa Code section 702.17 (1987).

■ Section 702.17 provides:

The term "sex act" or "sexual activity" means any sexual contact between two or more persons, by penetration of the penis into the vagina or anus, by contact between the mouth and the genitalia or by contact between the genitalia of one person and the genitalia or anus of another person or *by use of artificial sexual organs or substitutes therefore in contact with the genitalia or anus.* [Emphasis added.]

In *State v. Whetstine,* 315 N.W.2d 758, 763 (Iowa 1982), we held that the digital penetration of genitalia was within the purview of this section. As the statute refers in the alternative to "genitalia or anus," it is clear digital penetration of an anus is also encompassed by this provision.

■ As we have already noted, our review of this appeal is de novo. We find, as did the juvenile court, that Jay committed a delinquent act by sexually abusing Brad. Specifically, we find that Jay inserted a finger into Brad's anus, and that at the time of this contact Jay was using his finger as a substitute for a penis, in violation of Iowa Code sections 709.1 and 709.3 (1987).

We are mindful the evidence in this case is not entirely one-sided. In his earliest statements Brad denied the incident took place. There are allegations other four-year-old boys at the day care center engaged in sexual experimentation. The age of Brad's injury cannot be precisely determined. And Brad did not make an in-court identification of Jay as the perpetrator.

However, the medical evidence is undisputed: Brad was the victim of an assault on his anus that included the insertion of an object smaller than a penis. Moreover, Brad has steadfastly maintained since shortly after his initial interviews with the child abuse investigators that Jay licked his bottom and inserted a finger into his bottom. He has always identified the location of the incident as the YMCA, shortly after swimming. There is no dispute Jay worked at the day care center Brad attended and was responsible for helping the male children change clothes at the YMCA. Further, Brad has never stated anyone else ever assaulted him in that manner; in fact, he has consistently denied that any other such contact ever occurred.

For the purpose of determining whether Jay's conduct constituted a "sex act," we find it significant he licked Brad's bottom as well as inserting his finger. This clearly belies his implication that he was just checking to see if Brad had soiled his pants. We believe the circumstances reveal the sexual purpose for which Jay's finger was used.

■ We conclude the juvenile court's adjudication and disposition of Jay was correct. As we have reached this conclusion upon de novo review, any alleged failure by the juvenile court to file findings of fact and conclusions of law sufficient to satisfy Iowa Code section 232.47(8) (1987) did not prejudice Jay.

AFFIRMED.

All Justices concur except LAVORATO, SCHULTZ, CARTER and ANDREASEN, JJ., who dissent.

LAVORATO, J. (dissenting).

I dissent because I do not believe there is sufficient evidence that the delinquent act alleged was committed.

I would reverse.

SCHULTZ, CARTER and ANDREASEN, JJ., join this dissent.