**IN THE SUPREME COURT OF IOWA**

No. 22–0522

Submitted February 21, 2024—Filed June 28, 2024

**STATE OF IOWA,**

      Appellee,

vs.

**DEREK MICHAEL WHITE,**

      Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Osceola County, Shayne L. Mayer, Judge.

Derek White contends that his right of confrontation under the Iowa Constitution was violated. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

May, J., delivered the opinion of the court, in which McDonald, Oxley, and McDermott, JJ., joined. Christensen, C.J., filed a dissenting opinion, in which Waterman and Mansfield, JJ., joined.

Martha J. Lucey, State Appellate Defender, and Rachel C. Regenold (argued), Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Genevieve Reinkoester (argued) and Susan Krisko, Assistant Attorneys General, for appellee.

**MAY, Justice.**

Under the Iowa Constitution, Iowans who are accused of crimes are guaranteed the right to confront witnesses who testify against them at trial. At the time when the Iowa Constitution was adopted, this confrontation right was understood to mean that the accused must be able to confront trial witnesses face-to-face. The Iowa Constitution guarantees that same protection today.

Here we consider whether the Iowa Constitution was violated during the trial of Derek White. Two child witnesses testified against White. These two witnesses were allowed to testify from outside of the courtroom. Meanwhile, White had to stay in the courtroom. A closed-circuit television system allowed White to see the witnesses. But the television system was a "one-way" system rather than a "two-way" system. This meant that the witnesses could not see White while they testified against him.

We conclude that this procedure violated White's confrontation right under the Iowa Constitution. When the accused and the witness are prevented from seeing each other, there is no face-to-face confrontation, and the Iowa Constitution is not satisfied. We reverse White's convictions and remand for a new trial.

## I. Background.

White lived with Donna Reisdorfer and several children. We discuss only those children who are relevant to this case. Two of the children were White's sons, M.W. and J.W. Another was Reisdorfer's son, D.C.

In May 2020, a social worker visited White and Reisdorfer's home. This led to the discovery that Reisdorfer's two-year-old son, D.C., had suffered extensive bruising. D.C. had bruises of various colors on his face, ear, neck, shoulders, back, thighs, and ankles. Linear marks on D.C.'s face were consistent with being hit with a belt.

White and Reisdorfer were jointly charged with neglect or abuse of a child as well as child endangerment causing bodily injury. The trial information identified D.C. as the child victim.

As trial approached, the State filed a notice of additional witnesses. The new witnesses were two of White's sons, J.W. and M.W. The State also filed a motion requesting that "the trial testimony of J.W. and M.W. be done by closed-circuit equipment as set out in Iowa Code [section] 915.38 [(2020)]." That provision states, in relevant part:

> 1. *a.* Upon its own motion or upon motion of any party, a court may protect a minor, as defined in section 599.1, from trauma caused by testifying in the physical presence of the defendant where it would impair the minor's ability to communicate, by ordering that the testimony of the minor be taken in a room other than the courtroom and be televised by closed-circuit equipment for viewing in the courtroom. However, such an order shall be entered only upon a specific finding by the court that such measures are necessary to protect the minor from trauma. Only the judge, prosecuting attorney, defendant's attorney, persons necessary to operate the equipment, and any person whose presence, in the opinion of the court, would contribute to the welfare and well-being of the minor may be present in the room with the minor during the minor's testimony. The judge shall inform the minor that the defendant will not be present in the room in which the minor will be testifying but that the defendant will be viewing the minor's testimony through closed-circuit television.

*Id.* § 915.38(1)(*a*).

White resisted the motion. White argued that permitting "testimony of two nonvictim children" via closed-circuit television would violate White's constitutional rights. White relied on the confrontation rights guaranteed by the Sixth Amendment to the United States Constitution as well as those guaranteed by article I, section 10 of the Iowa Constitution. White argued that Iowa's constitution requires "an even stricter approach" than federal courts' interpretations of the Sixth Amendment. "At the very least," White argued, "Article I Section 10 requires in person, face-to-face testimony of nonvictim

witnesses." In the alternative, White argued, "if the court is inclined to allow such procedure to go forward, the testimony should be a two-way system so that the witness can see the defendant."

The court held a hearing on the motion. An expert explained that testifying in front of White would be traumatic for M.W. and J.W. and could prevent them from reasonably communicating. The court found that the expert's testimony was credible and that the requirements of section 915.38(1)(*a*) were satisfied. The court also rejected White's constitutional arguments. Accordingly, the court granted the State's motion.

The case proceeded to trial against White alone. Reisdorfer was no longer a codefendant.

Consistent with its order granting the State's motion, the court permitted M.W. and J.W. to testify outside of the courtroom. Specifically, M.W. and J.W. testified in the judge's chambers, which is to say, the judge's office. The judge, the lawyers, and the court reporter were all in the chambers when M.W. and J.W. testified. White was not allowed to be in the chambers. White and the jurors had to remain in the courtroom where they viewed the testimony through a "one-way" closed-circuit television system. A "two-way" television system was not used. This meant that M.W. and J.W. could not see White when they testified against him.

J.W. testified that he was eight years old and in second grade. He identified White as his "dad." J.W. recalled the period when he lived with White, Reisdorfer, and the other children. J.W. testified that he shared a room with D.C. and M.W. When J.W. was asked "who did the spankings" when D.C. "got in trouble," J.W. said it was White. And J.W. volunteered that "[h]e spanked with his belt." J.W. testified that sometimes these spankings would occur upstairs when J.W. was downstairs. When J.W. was asked, "So how did you know it was happening

upstairs[?]" he responded, "I heard it." "So did you hear [D.C.] crying and screaming?" J.W. was asked. He responded: "Oh, yeah. He screamed pretty loud."

J.W. was also asked about Reisdorfer. J.W. was asked if he "ever [saw] [Reisdorfer] doing any spankings?" J.W. responded, "No." He added, "She never spanks."

M.W. testified next. M.W. testified that he was eleven years old. When asked about "who Derek White is," M.W. said, "He was my bio dad and he was not safe." M.W. recalled the time when he lived with White and Reisdorfer. M.W. confirmed that D.C. lived with them. M.W. recalled that when D.C. got in trouble, D.C. would sometimes receive spankings. M.W. confirmed that White "would be doing the spankings." M.W. also confirmed that, even when he couldn't see, he would know a spanking was occurring because he "could hear [D.C.] crying outloud." During these spankings, M.W. could sometimes hear White speak— and White would sound "[m]ad." M.W. didn't think he had ever seen Reisdorfer "do any spankings."

Several other witnesses also testified. They included a child abuse expert, an investigating officer, a child protection worker, and a treating provider. The officer and child protection worker testified about how they found D.C. bruised when they removed him from the home. Many witnesses spoke about D.C.'s bruises—that they were "extensive" and unlikely to be accidental.

Some witnesses testified about discussions they had had with Reisdorfer and White about D.C.'s bruises. Reisdorfer and White had offered innocent explanations for the bruising, like Reisdorfer's statement that D.C. "was a clumsy kid." Neither Reisdorfer nor White had said that D.C.'s injuries came from abuse. And neither of them had implicated the other as an abuser.

J.W. and M.W. were the only trial witnesses who had lived with White, Reisdorfer, and D.C. during the period of White's alleged crimes. They were also the only witnesses to testify that it was White—not Reisdorfer—who spanked the children. No other witness testified to hearing or seeing any spankings or other discipline in the house where White, Reisdorfer, and D.C. lived.

J.W. and M.W. were also the only witnesses to testify from outside the courtroom. All other witnesses testified in the courtroom despite some remaining COVID-19 concerns. The child abuse expert—who worked in Omaha, Nebraska—traveled to Sibley, Iowa to testify in person.

During closing arguments, the prosecutor relied heavily on the testimony of M.W. and J.W. The prosecutor recalled their testimony that White was the person who was "doing the discipline" to D.C. The prosecutor noted that "[w]e have [White] was the one that did the spankings. You heard from his two children." The prosecutor pointed out to the jury that "you have the evidence from the kids who . . . could hear [D.C.] screaming as he got his spankings." And the prosecutor noted that "we have one of [White's] children saying" that White uses a belt "when he doesn't use his hand."

The prosecutor emphasized M.W. and J.W.'s testimony that White would take D.C. "to a different room" for spankings. In responding to defense counsel's suggestion that White would only spank D.C. "on the butt," the prosecutor asked rhetorically, "[T]hen why would [White] need to take [D.C.] away from everybody else and remove him to a different room to just spank him on the butt?" "Or was [White] so angry," the prosecutor asked, "that he took [D.C.] to a different room [on] a different floor that the kids could still hear him yelling at a 2-year-old while the 2-year-old was screaming and crying because he was out of control and he beat him, which is exactly what happened."

The prosecutor also used M.W. and J.W.'s testimony to eliminate Reisdorfer as a possible cause of D.C.'s injuries. The prosecutor reminded the jury that "the White children agreed she never did the spankings."

The jury found White guilty as charged. This appeal followed. On appeal, White argues that (1) the procedure used for the testimony of M.W. and J.W. violated his right of confrontation under article I, section 10 of the Iowa Constitution, (2) substantial evidence did not support his convictions, (3) the jury was not properly instructed, (4) the district court did not properly respond to a question from the jury, and (5) the district court abused its discretion in ordering restitution.

We transferred White's appeal to the Iowa Court of Appeals. A panel of the court affirmed White's convictions. White sought further review. We granted further review to consider White's argument that his confrontation right under the Iowa Constitution was violated through the procedure used for M.W. and J.W.'s testimony. We review that question de novo. *State v. Kennedy*, 846 N.W.2d 517, 520 (Iowa 2014).

**II. Analysis.**

**A. The Confrontation Right.** Article I of the Iowa Constitution guarantees certain rights to persons who are accused of crimes. Important here, section 10 of article I provides that "[i]n all criminal prosecutions . . . the accused shall have a right . . . to be confronted with the witnesses against him" or her. Iowa Const. art I, § 10 (confrontation clause). This is sometimes called the confrontation right.

Our interpretation of the Iowa Constitution is governed by familiar principles. We are bound by the "words used by the framers." *State v. Senn*, 882 N.W.2d 1, 8 (Iowa 2016) (quoting *Star Equip., Ltd. v. State*, 843 N.W.2d 446, 457 (Iowa 2014)). The meaning of those words was fixed when they were adopted. *See*

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 78 (2012) (discussing the "Fixed-Meaning Canon" that "[w]ords must be given the meaning they had when the text was adopted"); *cf. Save Our Stadiums v. Des Moines Indep. Cmty. Sch. Dist.*, 982 N.W.2d 139, 146 n.3 (Iowa 2022) (emphasizing the importance of "holding to the original public meaning of the words of [a] statute at the time it was enacted"). So we must read the framers' words "in historical perspective." *State v. Briggs*, 666 N.W.2d 573, 582 (Iowa 2003); *see also id.* at 578 (declining to adopt an "interpretation that incorporates modern understandings" of the words of the sufficient sureties clause). We must read those words as they were "commonly understood" at the time of their adoption. *N. W. Halsey & Co. v. City of Belle Plaine*, 104 N.W. 494, 495–96 (Iowa 1905). Indeed, it is "our duty" to " 'give the words used by the framers their natural and commonly-understood meaning' in light of the 'circumstances at the time of adoption.' " *State v. Burns*, 988 N.W.2d 352, 360 (Iowa 2023) (quoting *Senn*, 882 N.W.2d at 8). In this way, we strive to fulfill our larger duty of "provid[ing] at a minimum the degree of protection" that the Iowa Constitution "afforded when it was adopted." *State v. Wright*, 961 N.W.2d 396, 402 (Iowa 2021) (quoting *United States v. Jones*, 565 U.S. 400, 411 (2012)).

Our current Iowa Constitution was adopted in 1857. At the time when our constitution was adopted, a "confrontation" was understood to involve a "face to face" encounter. *Dictionary of the English Language* 85 (abr. rev. ed. 1856) (defining "confront" to mean "[t]o stand face to face; to stand in direct opposition; to set face to face, as an accused person and a witness in court," and defining "confrontation" to mean "[a] bringing face to face"). Likewise, at the time when our constitution was adopted, the right of confrontation was understood to mean that the accused must be allowed to confront trial witnesses face-to-face. In our 1869 decision in *State v. Reidel*, we said that under article I, section 10, the

accused "has the right to see the witnesses against him, face to face." 26 Iowa 430, 437 (1869). In our 1871 decision in *State v. Collins*, we emphasized that article I, section 10 is "a clear and express declaration of the *right* of the defendant 'in a criminal prosecution' 'to be confronted with the witnesses against him.' " 32 Iowa 36, 40 (1871). "This right to have them brought into court, where he can see them, while they give evidence against him, is secured by this constitutional provision," we noted. *Id.* And "[t]heir testimony can be given only . . . face to face with the accused." *Id.*

This right of face-to-face confrontation was acknowledged in other states' cases from the same period. *See, e.g., Campbell v. State*, 11 Ga. 353, 374 (1852) ("The right of a party accused of a crime, to meet the witnesses against him, face to face, is no new principle. It is coeval with the Common Law. Its recognition in the Constitution was intended for the two-fold purposes of giving it prominence and permanence."), *abrogated in part on other grounds by Smith v. State*, 177 S.E. 711 (Ga. 1934); *State v. Bunger*, 14 La. Ann. 461, 467 (1859) ("The Constitution guarantees to the accused that he shall not be prosecuted except upon an indictment or information, and that he shall have a speedy public trial by an impartial jury of the vicinage and the right of meeting the witnesses face to face."); *Barron v. People*, 1 N.Y. 386, 391 (1848) (observing that the federal confrontation right "means something more than that the accused shall have the right to stand face to face with his accuser out of court" and that "[w]e cannot very well overestimate the importance of having the witness examined and cross-examined in presence of the court and jury").

Similarly, federal courts "have long construed" the Confrontation Clause of the Sixth Amendment to the United States Constitution to guarantee a right of face-to-face confrontation with trial witnesses. *State v. Rogerson*, 855 N.W.2d 495, 498 (Iowa 2014). This includes the United States Supreme Court, whose

opinions have traditionally recognized "[t]he right to a literal face-to-face confrontation." Marc C. McAllister, *The Disguised Witness and* Crawford*'s Uneasy Tension with* Craig*: Bringing Uniformity to the Supreme Court's Confrontation Jurisprudence*, 58 Drake L. Rev. 481, 527–28 (2010) [hereinafter McAllister] (discussing *Dowdell v. United States*, 221 U.S. 325 (1911), and *Kirby v. United States*, 174 U.S. 47 (1899)).

In his 1988 majority opinion in *Coy v. Iowa*, Justice Scalia confirmed that the Supreme Court has "never doubted" that the confrontation right "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." 487 U.S. 1012, 1016 (1988); *see also Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987) ("The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination."); *Dowdell*, 221 U.S. at 328–29 ("[T]he statement was not sworn to, [and] the plaintiffs in error were not given the opportunity to meet the witnesses face to face . . . ."); *Kirby*, 174 U.S. at 55 ("Instead of confronting Kirby with witnesses to establish [a] vital fact[,] . . . he was confronted only with the record of another criminal prosecution, . . . and the evidence in which was not given in his presence.").

In 2014, our court noted *Coy*'s emphasis on "the fundamental role that face-to-face confrontation has *always* played in judicial proceedings." *Rogerson*, 855 N.W.2d at 498 (emphasis added). We quoted this excerpt from *Coy*:

> The Sixth Amendment's guarantee of face-to-face encounter between witness and accused serves ends related both to appearances and to reality. This opinion is embellished with references to and quotations from antiquity in part to convey that there is something deep in human nature that regards face-to-face confrontation between accused and accuser as "essential to a fair trial in a criminal prosecution." What was true of old is no less true in modern times.

*Id.* at 498–99 (quoting *Coy*, 487 U.S. at 1017) (citing *Pointer v. Texas*, 380 U.S. 400, 404 (1965)).

Likewise, we conclude that the confrontation right enshrined in article I, section 10 of the Iowa Constitution includes a guarantee of face-to-face confrontation between the accused and trial witnesses. Our constitution afforded this protection when it was adopted. *See, e.g.*, *Reidel*, 26 Iowa at 437 (explaining that under article I, section 10, the accused "has the right to see the witnesses against him, face to face"); *Collins*, 32 Iowa at 40 (stating that the testimony of trial witnesses "can be given only . . . face to face with the accused"). Our constitution affords the same protection today. *See Wright*, 961 N.W.2d at 402 (emphasizing that our constitution "must provide at a minimum the degree of protection" that it "afforded when it was adopted" (quoting *Jones*, 565 U.S. at 411)).

This conclusion does not end our analysis, though. It does not tell us exactly what the face-to-face confrontation must involve. It does not specify all of the components that make up the right.

For purposes of this case, though, we need not catalog *all* of the right's components. Nor do we need to catalog all of the components of White's confrontation right that may have been violated at his trial. Rather, this case only requires us to decide whether *any* important component of the right was violated. If so, and if the violation was not harmless, then we must reverse White's convictions.

**B. Application.** We first consider whether the right of face-to-face confrontation was violated in White's trial. We believe it was.

At a minimum, face-to-face confrontation requires that trial witnesses must be *both* visible to the accused *and also* able to see the accused. Two-way visibility—the ability to see each other—is inseparable from the idea of a face-to-

face confrontation. So when the witness and the accused are prevented from seeing each other, there can be no face-to-face confrontation, and the Iowa Constitution cannot be satisfied.

That is what happened here. Two child witnesses were allowed to testify at trial. They testified from the judge's chambers—an office that is separate from the courtroom. Meanwhile, White had to stay in the courtroom. This prevented White and the witnesses from seeing each other directly.

It is true, of course, that a closed-circuit television system allowed White to see the witnesses indirectly. But it was not a "two-way" television system. Instead, the court used a "one-way" system. It did not allow the witnesses to see White while they testified against him. *See United States v. Bordeaux*, 400 F.3d 548, 554 (8th Cir. 2005) ("It is true that a two-way closed-circuit television creates an encounter that more closely approximates a face-to-face confrontation than a one-way closed-circuit television does because a witness can view the defendant with a two-way system.").

Because the witnesses were prevented from seeing White when they testified against him, there was no face-to-face confrontation. This violated White's right of confrontation under article I, section 10 of the Iowa Constitution.

**C. Counterarguments.** We have considered all of the arguments raised by the State and our colleagues in the dissent. We discuss several of those arguments below.

1. *The necessity of two-way visibility.* We acknowledge that not all authorities recognize the necessity of assuring that witnesses can see the accused. *See, e.g., State v. Strable*, 313 N.W.2d 497, 500–01 (Iowa 1981). For instance, in *State v. Strable*, this court considered a challenge to the placement of a blackboard between the accused and a witness. *Id.* We considered but did not decide whether this procedure violated the right of confrontation under the

Sixth Amendment or article I, section 10. *Id.* at 501. Rather, we assumed that the procedure was improper. *Id.* We then resolved the case on harmless error grounds. *Id.* In our discussion of the confrontation right, however, we quoted various authorities for the proposition that the "purposes" of the confrontation right did not include "the idle purpose of gazing upon the witness, *or of being gazed upon by him.*" *Id.* at 500 (emphasis added) (quoting *Davis v. Alaska*, 415 U.S. 308, 316 (1974)).

We disavow the comments just quoted. The ability of trial witnesses to see the accused is hardly an "idle purpose." Rather, as explained, the ability of the witness to see the accused is *essential* to a face-to-face confrontation. And so we reject any procedure that prevents trial witnesses from being able to see the accused. *See Coy*, 487 U.S. at 1016–17. We believe that such procedures create "obvious" and "damaging" violations of the accused's right of face-to-face confrontation. *Id.* at 1020.

Such procedures are also inconsistent with the truth-telling function of face-to-face confrontation. Most adults and many children understand that "[i]t is always more difficult to tell a lie about a person 'to his face' than 'behind his back.'" *Id.* at 1019. And if a witness does lie about a person "to his face," the lie "will often be told less convincingly." *Id.* This is not to say that the confrontation right "compel[s] the witness to fix his eyes upon the" accused. *Id.* The witness may choose to "studiously look elsewhere." *Id.* If so, then the jury can "draw its own conclusions" as to what the witness's behavior says about the witness's credibility. *Id.* Regardless, the witness's ability to see the accused plays an important role in "ensur[ing] the integrity of the [jury's] fact-finding process" in criminal trials. *Id.* at 1019–20 (quoting *Kentucky v. Stincer*, 482 U.S. 730, 736 (1987)). And so we must insist that our courts permit trial witnesses to see the accused.

2. Maryland v. Craig. We also recognize that, in 1990, the Supreme Court held in *Maryland v. Craig* that "[s]o long as a trial court makes . . . a case-specific finding of necessity," the *Federal* Constitution does not prohibit the use of "a one-way closed circuit television procedure for the receipt of testimony by a child witness in a child abuse case." 497 U.S. 836, 860 (1990); *see also State v. Rupe*, 534 N.W.2d 442, 444–45 (Iowa 1995) (following *Craig* when applying a Sixth Amendment challenge to a closed-circuit television procedure). Even so, for the reasons already explained, we do not believe that *Iowa*'s constitution permits the use of one-way television systems for trial witnesses. Because one-way systems do not allow the witness to see the accused, one-way systems do not satisfy our constitution's guarantee of face-to-face confrontation.

To be clear, though, no one should doubt our great respect for the United States Supreme Court. When questions of federal law arise, we are plainly "bound by the decisions of the United States Supreme Court." *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 75 (Iowa 2014). As to questions of state law, we afford "respectful consideration" to the Supreme Court's precedents. *Wright*, 961 N.W.2d at 402.

At the same time, we have emphasized that federal court opinions about the *Federal* Constitution do not dictate *our* interpretation of the Iowa Constitution. *See, e.g.*, *id.*; *State v. Ochoa*, 792 N.W.2d 260, 267 (Iowa 2010) ("In order to resolve any inconsistency in our prior cases, we now hold that, while United States Supreme Court cases are entitled to respectful consideration, we will engage in independent analysis of the content of our state search and seizure provisions."); *State ex rel. Kuble v. Bisignano*, 28 N.W.2d 504, 508 (Iowa 1947) ("It is true Article I, section 8, of the Iowa Constitution is identical in language with the Fourth Amendment. This fact however does not compel us to follow the construction placed on the language by the United States Supreme Court.").

Indeed, when it comes to "questions of state constitutional law, the Supreme Court 'is, in law and in fact, inferior in authority to' " this court. *Wright*, 961 N.W.2d at 403 (quoting *McClure v. Owen*, 26 Iowa 243, 249 (1868)). The Supreme Court agrees that this is true. The Supreme Court acknowledges that it "must accept whatever construction of a state constitution is placed upon it by the highest court of the State." *North Carolina v. Butler*, 441 U.S. 369, 376 n.7 (1979). The Supreme Court acknowledges that *this* court "is the final arbiter" of what our state constitution means. *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law."); *see also Minnesota v. Nat'l Tea Co.*, 309 U.S. 551, 557 (1940) ("It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions.").

We do not take this duty lightly. Rather, "[w]e jealously guard our right to construe a provision of our state constitution differently than its federal counterpart." *State v. Brown*, 930 N.W.2d 840, 847 (Iowa 2019) (quoting *State v. Brooks*, 888 N.W.2d 406, 410 (Iowa 2016)). We do so even when parallel state and federal provisions "contain nearly identical language and have the same general scope, import, and purpose." *Id.* (quoting *Brooks*, 888 N.W.2d at 411).

As one particular: when a federal interpretation of a federal provision "is not consistent" with the text of the Iowa Constitution as originally understood, "the federal interpretation should not govern our interpretation" of the Iowa Constitution. *Burns*, 988 N.W.2d at 360. Rather, our interpretation of the Iowa Constitution must square with its text as originally understood. *Wright*, 961 N.W.2d at 412. Our interpretation must provide "at a minimum the degree of protection" that the Iowa Constitution "afforded when it was adopted." *Id.* at 402 (quoting *Jones*, 565 U.S. at 411).

Applying these principles here, we do not believe *Craig* should govern our interpretation of the Iowa Constitution. Under *Craig*, the *Federal* Constitution *does not* guarantee the accused's right of face-to-face confrontation with trial witnesses. Rather, *Craig* said that the Federal Constitution reflects only "a *preference* for face-to-face confrontation at trial." 497 U.S. at 849 (quoting *Ohio v. Roberts*, 448 U.S. 56, 63 (1980), *overruled by Crawford v. Washington*, 541 U.S. 36 (2004)). That "preference," *Craig* said, may be outweighed by public policy concerns reflected in statutory law. *Id.* at 849, 852.

*Craig*'s view cannot be reconciled with our understanding of the Iowa Constitution. As we have explained, the Iowa Constitution does not include a mere "preference" for face-to-face confrontation with trial witnesses. Rather, as explained, the Iowa Constitution guarantees the accused's right of face-to-face confrontation with witnesses who testify at trial.

Because our understanding of the Iowa Constitution cannot be harmonized with *Craig*'s view of the Federal Constitution, we decline to adopt *Craig*'s approach for purposes of the Iowa Constitution.

We add two final points concerning *Craig*. First, we acknowledge White's suggestion that *Craig* was undermined by the Supreme Court's later decision in *Crawford v. Washington*, 541 U.S. at 46. *See, e.g.*, *United States v. Cox*, 871 F.3d 479, 492 (6th Cir. 2017) (Sutton, J., concurring) (noting that although "*Crawford* did not overturn *Craig*[,] . . . the two opinions would give Janus a run for his money"); McAllister, 58 Drake L. Rev. at 509 ("*Crawford*'s reasoning has a potentially profound impact on *Craig*."). To avoid any confusion: Because the Supreme Court has not expressly overturned *Craig*, we will continue to view *Craig* as binding precedent for purposes of *federal* rights under the Sixth Amendment to the United States Constitution. As explained, though, we view White's *state* law rights through a different lens.

Finally, we note the dissent's concern that after our decision today, Iowa "stands alone" as the only state that has not followed *Craig* when interpreting a state confrontation right. *But cf. Brady v. State*, 575 N.E.2d 981, 986–87 (Ind. 1991) (citing *Craig* when analyzing the federal confrontation right but not when describing the state confrontation right); *People v. Jemison*, 952 N.W.2d 394, 400 (Mich. 2020) (limiting "*Craig* only to the specific facts it decided"). But we see no other path. Our court must decide what the Iowa Constitution means. That is our duty. We believe this duty requires us to "provide at a minimum the degree of protection" that our constitution "afforded when it was adopted." *Wright*, 961 N.W.2d at 402 (quoting *Jones*, 565 U.S. at 411). And for the reasons explained, we do not believe *Craig*'s approach affords that minimum degree of protection. So we cannot follow *Craig*.

3. In re J.D.S. We have also considered our decision in *In re J.D.S.*, 436 N.W.2d 342 (Iowa 1989) (en banc). *J.D.S.* arose from charges of sexual abuse by a teenage juvenile, whom we called "Jay." *Id.* at 343. The alleged victim was a young child, whom we called "Brad." *Id.* At the adjudicatory hearing, the court took Brad's testimony in a room separate from Jay. *Id.* at 344. "By the use of a one-way mirror, Jay was able to observe Brad, but Brad could not see Jay." *Id.* at 345. Jay objected to this procedure. *Id.* at 347. Jay claimed that the procedure violated his confrontation rights under both the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution. *Id.* at 345–46. The juvenile court overruled Jay's objections. *Id.* at 346. And, ultimately, the juvenile court found that Jay had sexually abused Brad. *Id.* at 343. Jay appealed. *Id.*

On appeal, Jay renewed his confrontation argument *under the Sixth Amendment. Id.* at 346–47. It is not clear, though, whether Jay renewed any argument under *the Iowa* Constitution. *See id.* at 347. In any event, Jay did not

argue for an *independent* interpretation of the Iowa Constitution. *See id.* In other words, Jay did not argue that this Iowa court should construe the Iowa Constitution any differently than federal courts construe the United States Constitution.

Ultimately, our court found that the procedure used in Jay's hearing "did not violate Jay's right of confrontation under the federal or Iowa constitutions." *Id.* at 347. As support for this conclusion, we relied on federal caselaw interpreting the Sixth Amendment. *Id.* at 345. We did not discuss Iowa cases interpreting the Iowa Constitution. We did not discuss the possibility of an independent approach under the Iowa Constitution.

From a procedural perspective, then, *J.D.S.* was wholly different from White's case. Effectively, *J.D.S.* was presented to our court as a Sixth Amendment case. The accused in *J.D.S.* did not ask our court to consider an independent approach under the Iowa Constitution; therefore, the *J.D.S.* court did not consider an independent approach. *Id.* at 346–47. Note, though, that this observation implies no criticism of the *J.D.S.* court or its method. The court's method was consistent with party-presentation principles. Its method was consistent with our rule that "[w]here a party raises issues under the Iowa Constitution and the Federal Constitution, *but does not suggest a different standard be applied under the Iowa Constitution,* we generally apply the federal standard." *State v. Edouard,* 854 N.W.2d 421, 452 (Iowa 2014) (Appel, J., concurring specially) (emphasis added), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.,* 880 N.W.2d 699 (Iowa 2016). For example, in both *State v. Kennedy* and *In re J.C.,* we declined "to interpret the" confrontation right under the "Iowa Constitution any differently from" the confrontation right under "the United States Constitution" *because* the accused had not "propose[d] a specific

test we should apply under article I, section 10 of the Iowa Constitution." *In re J.C.*, 877 N.W.2d 447, 452 (Iowa 2016) (quoting *Kennedy*, 846 N.W.2d at 522).

Compare those (wholly different) cases with White's appeal. While the accused in those cases focused on the Sixth Amendment, White has formally *abandoned* the Sixth Amendment. White relies *exclusively* on the Iowa Constitution. More importantly, White relies exclusively on an *independent approach* to the Iowa Constitution. And unlike the accused in *J.D.S.*, *J.C.*, and *Kennedy*, White proposes *a specific test* for us to apply under the Iowa Constitution. Specifically, White proposes that article I, section 10 must be interpreted to provide at least "the minimum degree of protection" that it "afforded when adopted." (Quoting *Wright*, 961 N.W.2d at 402.) In White's view, this means that Iowa's constitution "requires that defendants meet accusers face to face."

We generally agree with White. As explained, we agree that article I, section 10 must afford at least "the minimum degree of protection" that it "afforded when adopted." *Wright*, 961 N.W.2d at 402. We also agree that this protection includes a guarantee that the accused may confront trial witnesses face-to-face. Therefore, as explained, we conclude that the Iowa Constitution does not permit procedures (like those used in White's trial) that prevent trial witnesses from seeing the accused.

In light of this conclusion, we must correct our statement in *J.D.S.* about the Iowa Constitution. Contrary to our statement in *J.D.S.*, the Iowa Constitution does not permit one-way mirrors or other procedures that prevent witnesses from seeing the accused. As to that statement, *J.D.S.* reflects a demonstrably erroneous view of the Iowa Constitution. Therefore, as to that statement, we must overrule *J.D.S. See* Iowa Const. art. XII, § 1 (providing that "any law inconsistent" with the constitution "shall be void"); *Garrison v. New Fashion Pork*

*LLP*, 977 N.W.2d 67, 83 (Iowa 2022) (quoting *Goodwin v. Iowa Dist. Ct.*, 936 N.W.2d 634, 649 (Iowa 2019) (McDonald, J., concurring specially), which in turn quotes *Gamble v. United States*, 587 U.S. 678, 718 (2019) (Thomas, J., concurring), for the following proposition: "Thus, '[w]hen faced with a demonstrably erroneous precedent, my rule is simple: We should not follow it. This view of stare decisis follows directly from the Constitution's supremacy over other sources of law—including our own precedents.' " (alteration in original)).

4. *Children as victims and witnesses.* We have also considered the idea that crimes against children are purely modern phenomena that the framers could not anticipate. This is not so. For instance, under the 1839 territorial laws, any male "of the age of fourteen years and upwards" could be imprisoned for "not less than twenty years" upon conviction of having "carnal knowledge of any female child under the age of ten years." Iowa Stat. div. I, § 20 (1839). Under the 1851 Code, "any person" who "carnally kn[e]w and abuse[d] any female child under the age of ten years" could be punished by life imprisonment. Iowa Code § 2581 (1851); *see also State v. Newton*, 44 Iowa 45, 47 (1876) (noting that under section 3861, "[c]arnal knowledge of a female child under ten years of age" constituted the crime of rape).

Child witnesses are not new, either. Under the 1860 Code, "[e]very human being of sufficient capacity to understand the obligation of an oath, [was] a competent witness in all cases," including criminal cases. Iowa Code § 3978 (1860). The 1860 Code specifically mentioned "infants" as material witnesses, as did the 1851 Code. *Id.* § 3982 (1860); *id.* § 2878 (1851). And our cases confirm that children have long testified in criminal cases. For instance, in our 1899 opinion in *State v. Desmond*, we described the testimony of thirteen-year-old girls in a sexual abuse case involving an eleven-year-old victim. 80 N.W. 214, 214 (Iowa 1899).

Or consider *State v. Blair* from 1929. 223 N.W. 554, 556 (Iowa 1929). In *Blair*, an eleven-year-old sexual assault victim testified about the assault, that it "caus[ed] her much pain 'inside.' " *Id.* And her testimony was corroborated by testimony from her seven-year-old sister and her ten-year-old brother. *Id.* The jury was instructed that "though the court had found the children legally competent," they were "of such tender years that the jury [was] at liberty to find that they did not have as full an understanding of the obligation of an oath as that possessed by an adult of average intelligence." *Id.* at 558. Even so, the jury found the defendant guilty. *Id.* On appeal, the defendant argued that the jury should have also been instructed that "it is a matter of common knowledge that a child of tender years is capable of being 'molded like clay in the potter's hands.' " *Id.* at 557. We rejected this argument because it is not the court's province "to tell the jury what are and what are not matters of common knowledge." *Id.*

More examples could be discussed. *See, e.g., State v. Sherman*, 77 N.W. 461, 462–63 (Iowa 1898) (discussing the "testimony of" the victim, who was "under the age of thirteen years" when the crime occurred); *State v. Enright*, 58 N.W. 901, 901–02 (Iowa 1894) (noting that the fourteen-year-old victim "was examined as a witness"). It seems clear enough, though, that the founding generation was familiar with crimes against children as well as the important role that child witnesses could play in the prosecution of those crimes. But we see no reason to think that the framers would have denied the right of confrontation to an accused just because the case against him depended on the testimony of children.

5. *Other constitutional questions.* We acknowledge White's request for us to decide additional constitutional questions. Specifically, White asks us to declare that Iowa Code section 915.38(1)(*a*) (2020) is wholly invalid because *no* form of remote trial testimony could ever satisfy the Iowa Constitution. That question

would require us to decide whether or not a two-way television system could pass constitutional muster. But because a two-way system was not used in White's actual trial, our record does not describe an actual two-way system. And we decline to decide the constitutionality of a hypothetical system that may or may not be used in the future. *Cf. Bordeaux*, 400 F.3d at 555 ("Even if we assumed that a two-way system might conceivably capture the essence of the face-to-face confrontation in some situations, whether it actually did would turn on the answers to a myriad of hard logistical questions (How big must the monitor be? Where should it be placed? Where should the camera focused on the defendant be placed?) that would render the theoretical promise of the two-way system practically unattainable."); *Rogerson*, 855 N.W.2d at 504 ("Concededly, two-way videoconferencing technology available today more closely approximates face-to-face confrontation than one-way video. But despite its preferability over one-way transmission, we do not believe two-way videoconferencing is constitutionally equivalent to the face-to-face confrontation envisioned by the Sixth Amendment.").

**D. Harmless Error.** Because we conclude that White's confrontation right was violated, we must next consider whether reversal is required. Reversal is not required "if the State establishes that the error was harmless beyond a reasonable doubt." *State v. Newell*, 710 N.W.2d 6, 25 (Iowa 2006); *accord State v. Gibbs*, 941 N.W.2d 888, 900 (Iowa 2020) ("In order for a constitutional error to be harmless, the court must be able to declare it harmless beyond a reasonable doubt." (quoting *State v. Simmons*, 714 N.W.2d 264, 275 (Iowa 2006))). "Our task then is to evaluate the evidence, other than" the testimony of M.W. and J.W., "and to determine whether it was so overwhelming that we are abidingly convinced" that their testimony "did not contribute to the jury's finding of guilt." *State v. Coy*, 433 N.W.2d 714, 715 (Iowa 1988).

We are not so convinced. The State's theory was that White's discipline of D.C. included abusive beatings—sometimes involving the use of a belt. The testimony of M.W. and J.W. was crucial to this theory. No other witness lived in the house during the time of White's alleged crimes. No other witness could testify from actual experience about White's "spankings" of D.C. or about D.C.'s screaming. No other witness could testify that White sometimes used a belt. Most importantly, perhaps, no other witness was able to eliminate Reisdorfer as an alternative suspect. No other witness could confirm that Reisdorfer "never did the spankings." And no other evidence filled those gaps. So we cannot say that the testimony of M.W. and J.W. did not contribute to the jury's finding of guilt.

### III. Disposition.

We conclude that the procedure used for M.W. and J.W.'s testimony was not consistent with the confrontation right guaranteed by article I, section 10 of the Iowa Constitution. We reverse the court of appeals' refusal to grant a new trial on this basis. But we affirm the court of appeals' conclusion that sufficient evidence supported White's convictions. As to that issue, the court of appeals decision shall stand as our final decision. As to all other issues, we vacate the court of appeals opinion.

We reverse White's convictions and remand for a new trial. To be clear: The State is not precluded from introducing the testimony of M.W. and J.W. at White's new trial. If the State chooses to introduce their testimony, however, it must be presented in a manner that does not violate White's rights under the Iowa Constitution.

DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.

McDonald, Oxley, and McDermott, JJ., join this opinion. Christensen, C.J., files a dissenting opinion, in which Waterman and Mansfield, JJ., join.

**CHRISTENSEN, Chief Justice (dissenting).**

I respectfully dissent. Derek White was convicted of two forms of child abuse for the severe beatings he administered to the two-year-old son of his live-in girlfriend. White's own sons—aged eight and ten—were key witnesses in the case. Not surprisingly, the two boys were terrified by the prospect of testifying about their father's beatings in his physical presence. Therefore, in accordance with Iowa Code section 915.38(1)(*a*) (2020), the district court allowed their testimony to be given remotely in the personal presence of the judge and the attorneys but with White and the jury watching via video.

A hearing was held in which an expert explained that testifying in front of the defendant would be traumatic for the children and might prevent them from reasonably communicating. The district court found the expert's testimony credible and permitted the use of a one-way video connection. The children testified under oath in front of the judge in the judge's chambers alongside the prosecuting and defense attorneys, while the jury and White remained in the courtroom. The district court confirmed that defense counsel was satisfied with his ability to communicate with White during the children's testimony, if needed.

The legislature adopted section 915.38(1)(*a*) to cover cases *just like* this one. *See* 1998 Iowa Acts ch. 1090, § 31 (codified at Iowa Code § 915.38 (1999)). The United States Supreme Court has held that this type of procedure complies with the Sixth Amendment to the United States Constitution. *See Maryland v. Craig*, 497 U.S. 836, 860 (1990). We have held that this type of procedure also complies with article I, section 10 of the Iowa Constitution. *See In re J.D.S.*, 436 N.W.2d 342, 346–47 (Iowa 1989) (en banc). Yet, the majority tosses all this law aside and orders a new trial. I would instead uphold the constitutionality of section 915.38(1)(*a*) and affirm White's convictions.

In my view, it does not do justice to our decision in *In re J.D.S.* to treat it as a mere "counterargument." It is the controlling precedent. Yet rather than follow *J.D.S.*, the majority offers a convoluted two-page explanation for why the decision should be given less weight than the typical controlling precedent, and then flatly overrules it. I'm not persuaded. The majority also ignores the fact that the 1869 and 1871 cases that it relies on have nothing to do with children or video testimony. *See State v. Reidel*, 26 Iowa 430, 433, 436–38 (1869) (stating, in a case involving the intent to defraud a bank, that a "certificate or instrument of protest of the notary public" was not admissible "to prove the allegation that the defendant had no money on deposit in the bank"); *State v. Collins*, 32 Iowa 36, 41–42 (1871) (holding that the minutes of testimony taken of a witness during the preliminary examination of the charge were not admissible as evidence against the defendant in an assault with intent to commit murder trial because such evidence violated the defendant's right to be confronted with the witnesses against him).

Originalism has limits. It cannot account for a technology that didn't exist in 1857—when the Iowa Constitution was ratified—and a type of case that would not have been brought in 1857. White *was* able to confront the two boys to a meaningful degree. He watched them as they testified, and they knew he was watching. White's attorney was in the room with the boys and cross-examined them. There was a specific finding of special circumstances that is not challenged by the majority. I would therefore follow the holding of the Supreme Court in *Maryland v. Craig*, 497 U.S. at 860, and our court's precedent in *J.D.S.*, 436 N.W.2d at 346–47, to affirm the convictions.

Yet another problem with the majority opinion is its failure even to decide the case before it. The majority says that one-way video is constitutionally defective in all circumstances but doesn't say whether the child witnesses must testify

in the physical presence of the defendant or whether two-way video would be sufficient. The defendant has argued that physical presence is the constitutional minimum, so the issue is clearly raised and before us in this case. The majority, however, doesn't decide the issue; instead, it leaves the district court guessing on remand. This means that we will have perhaps a third trial unless the district court reads the majority's future intentions correctly. I think the majority owes everyone a full decision in this case and not an inconclusive remand that fails to decide part of the appeal.

## I. Child Witnesses Who Would Be Traumatized May Testify via One-Way Video.

It is well established that the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution guarantee an accused the right to confront and cross-examine witnesses. *See* U.S. Const. amend. VI; Iowa Const. art. I, § 10. The Confrontation Clause contained in the Sixth Amendment to the United States Constitution states, "In all criminal prosecutions, the accused shall . . . be confronted with the witnesses against him." Likewise, the confrontation clause contained in article I, section 10 of the Iowa Constitution provides, "In all criminal prosecutions, and in cases involving the life, or liberty of an individual the accused shall have a right . . . to be confronted with the witnesses against him." Notably, as the court of appeals pointed out, neither the Sixth Amendment nor article I, section 10 "mention[s] face-to-face or physical confrontation."

Children are legally different from adults. The constitutional rules for sentencing children are different. *State v. Lyle*, 854 N.W.2d 378, 404 (Iowa 2014) (holding that the Iowa Constitution "forbids a mandatory minimum sentencing schema for juvenile offenders"). Despite the literal text of article I, section 10, the constitutional rules for making a jury trial available to children are also different.

*In re Johnson*, 257 N.W.2d 47, 51 (Iowa 1977) ("[W]e conclude a juvenile is not constitutionally entitled to a trial by jury at a delinquency hearing under our constitution.").

Along the same lines, while caselaw under the Confrontation Clause shows a preference for face-to-face confrontation, the Supreme Court held in *Craig* that the preference "must occasionally give way to considerations of public policy and the necessities of the case." 497 U.S. at 849 (quoting *Mattox v. United States*, 156 U.S. 237, 243 (1895)). Thus, in *Craig*, the Supreme Court found that the use of a one-way closed-circuit television system for certain child testimony could be squared with the Confrontation Clause. *Id.* at 856–57. Specifically, the Court determined that "a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." *Id.* at 853. The Court in *Craig* ultimately held that

> if the State makes an adequate showing of necessity, the state inter-
> est in protecting child witnesses from the trauma of testifying in a
> child abuse case is sufficiently important to justify the use of a spe-
> cial procedure that permits a child witness in such cases to testify
> at trial against a defendant in the absence of face-to-face confronta-
> tion with the defendant.

*Id.* at 855.

Likewise, in *J.D.S.*, we held that a similar procedure involving a one-way mirror did not violate either the Sixth Amendment to the United States Constitution or article I, section 10 of the Iowa Constitution. 436 N.W.2d at 347. There, we explained,

> By enacting [the predecessor to section 915.38], the legisla-
> ture [evinced] its belief that protection of child witnesses is an im-
> portant public policy. The trial court found and, by our de novo re-
> view, we agree that the screening procedure employed in this case

was necessary to protect [the child] and comported with the statutory purpose. We also find the procedure to be reasonable and hold that it did not violate [the respondent's] right of confrontation under the federal or Iowa constitutions.

*Id.*

"Stare decisis alone dictates continued adherence to our precedent absent a compelling reason to change the law." *Book v. Doublestar Dongfeng Tyre Co.*, 860 N.W.2d 576, 594 (Iowa 2015). The majority disregards stare decisis by overruling *J.D.S.* without any compelling reason to do so. I would honor stare decisis and follow *J.D.S.*

And again, in *State v. Rupe*, we upheld the use of a one-way closed-circuit television system for a potentially traumatized child against a Sixth Amendment challenge. 534 N.W.2d 442, 444 (Iowa 1995). We said, "[W]e do not believe that Rupe's constitutional rights were in any way violated by the trial court's ruling." *Id.*

Despite this controlling law, the majority has crafted a contrary approach and relies on *Coy v. Iowa*, 487 U.S. 1012 (1988), to support its position that the use of one-way television system violates the right to confrontation under the Iowa Constitution. Under *Coy*, a witness is required to be in the courtroom to testify, but the Confrontation Clause cannot "compel the witness to fix his eyes upon the defendant." *Id.* at 1019. Does this mean a child would be permitted to squeeze his eyes shut while testifying? Or cover her eyes with her hands, a headband, or darkened glasses? Would such an action raise even more red flags for a defendant than allowing the child to testify in a different room without being able to see the defendant? If face-to-face confrontation were to cause "significant emotional distress in a child witness, there is evidence that such confrontation would in fact *disserve* the Confrontation Clause's truth-seeking goal." *Craig*, 497

U.S. at 857. I see no practical difference in allowing child witnesses to testify where the defendant can see them, but the children cannot see the defendant.

Further, Iowa Code section 915.38(1) is similar to procedures used by courts in other states. *See* Alaska Stat. § 12.45.046(e) (2023) ("The attorneys may pose questions to the child and have visual contact with the child during questioning, but *the mirrors shall be placed to provide a physical shield so that the child does not have visual contact with the defendant* and jurors." (emphasis added)); Ariz. Rev. Stat. Ann. § 13-4253(A) (2024) ("The court shall permit the defendant to observe and hear the testimony of the minor in person *but shall ensure that the minor cannot hear or see the defendant.*" (emphasis added)); Conn. Gen. Stat. § 54-86g(a) (2023) ("If the defendant is excluded from the room or screened from the sight and hearing of the child, the court shall ensure that the defendant is able to observe and hear the testimony of the child, *but that the child cannot see or hear the defendant.*" (emphasis added)); Fla. Stat. § 92.54(4) (2023) ("In such a case, the court shall permit the defendant to observe and hear the testimony of the victim or witness, *but must ensure that the victim or witness cannot hear or see the defendant.*" (emphasis added)); Kan. Stat. Ann. § 22-3434(c)(4) (2023) ("[T]he court shall permit the defendant to observe and hear the testimony of the child in person, *but shall ensure that the child cannot hear or see the defendant.*" (emphasis added)); Ky. Rev. Stat. Ann. § 421.350(2) (West 2023) ("The court shall permit the defendant to observe and hear the testimony of the child in person, *but shall ensure that the child cannot hear or see the defendant.*" (emphasis added)); La. Stat. Ann. § 15:283(B) (2024) ("The *court shall ensure that the protected person cannot see or hear the accused* unless such viewing or hearing is requested for purposes of identification." (emphasis added)); Md. Code Ann., Crim. Proc. § 11-303(g) (LexisNexis 2024) ("This section does not allow the use of two-way closed circuit television or other procedure that would

let a child victim see or hear a defendant or child respondent.”); Minn. Stat. § 595.02(4)(c)(1) (2023) (“[T]he defendant can see and hear the testimony of the child in person and communicate with counsel, *but the child cannot see or hear the defendant . . . .*” (emphasis added)); N.J. Rev. Stat. § 2A:84A-32.4(f) (2023) (“ ‘[C]losed circuit television’ . . . shall allow for the live observation of the victim or witness by the defendant, jury, and judge during the course of testimony or cross-examination, *while excluding a victim or witness from directly hearing or viewing the defendant during the proceedings.*” (emphasis added)); 42 Pa. Cons. Stat. § 5985(a) (2024) (“The court shall permit the defendant to observe and hear the testimony of the child victim or child material witness *but shall ensure that the child cannot hear or see the defendant.*” (emphasis added)); 11 R.I. Gen. Laws § 11-37-13.2(b) (2024) (“The court shall permit the defendant to observe and hear the testimony of the child in person, *but ensure that the child cannot hear or see the person alleged to have committed the assault.*” (emphasis added)); Tex. Code Crim. Proc. Ann. art. 38.071(3)(a) (West 2023) (“The court shall permit the defendant to observe and hear the testimony of the child and to communicate contemporaneously with his attorney during periods of recess or by audio contact, *but the court shall attempt to ensure that the child cannot hear or see the defendant.*” (emphasis added)); Utah R. Crim. P. 15.5(b)(1)(B) (“[T]he court shall ensure that the child cannot hear or see the defendant . . . .”).

Notably, my colleagues in the majority fail to cite a single appellate decision declining to follow *Craig* under a state constitution’s confrontation clause. Iowa now stands alone, as the majority concedes.

By including a couple of citations, the majority suggests that cases from Indiana and Michigan may indirectly support its position. That is not so. In *Brady v. State,* the Indiana Supreme Court interpreted its own constitution, adopted in 1851, which expressly provides defendants with the right “to meet

the witnesses face to face." 575 N.E.2d 981, 986–87 (Ind. 1991) (quoting Ind. Const. art. 1, § 13). Iowa's Constitution, adopted six years later, doesn't include that language. Even then, the Indiana Supreme Court held in *Brady* that a two-way video system would comply with Indiana's constitution. *Id.* at 989. In *People v. Jemison*, the Michigan Supreme Court held that video testimony from an out-of-state DNA expert—not a traumatized child—violated both the United States and the Michigan Constitutions. 952 N.W.2d 394, 400–01 (Mich. 2020). In doing so, the court applied federal precedent. *Id.* at 398–400. And while the majority says *Jemison*, under the Michigan confrontation clause, "limit[ed] '*Craig* only to the specific facts it decided' "—those facts fit like a glove here: "a child victim may testify against the accused by means of one-way video (or a similar *Craig*-type process) when the trial court finds, consistently with statutory authorization and through a case-specific showing of necessity, that the child needs special protection." *Id.* at 400. These cases do not support today's decision, and it is telling that the majority cites them as, presumably, the best authority it can find.

Moreover, the majority reaches this decision based on a mistaken view of originalism. There have been numerous developments since 1857 concerning juveniles in the law. Do we now go back to 1857 in all respects? Under the majority's view, I assume that jury trials in juvenile delinquency proceedings may now be required, since such cases involve the "liberty" of an individual. *Cf. Johnson*, 257 N.W.2d at 50–51.

The majority relies in part on blurbs from two cases decided some 150 years ago. *See Reidel*, 26 Iowa at 437; *Collins*, 32 Iowa at 40. Neither case is remotely relevant here. In *State v. Reidel*, we commented on the admissibility of a written notarial certificate in lieu of live testimony. 26 Iowa at 435–39. We said the written certificates at issue should not have been admitted in lieu of live

testimony. *Id.* at 437. But the real problem was that the state did not prove that the defendant lacked funds at the bank in a case involving intent to defraud charges; for that, testimony from a bank officer was needed. *Id.* at 437–38. So, what we said in *Reidel* was dicta. In *State v. Collins*, the state read the minutes of testimony of an adult witness into evidence in lieu of live testimony. 32 Iowa at 39. We held that the Iowa Constitution did not permit this. *Id.* at 40–41.

Neither case has anything to do with traumatized child witnesses or one-way video technology. Indeed, the type of child abuse committed by the defendant here potentially would not even have been prosecuted in the nineteenth century. *See Rowe v. Rugg*, 91 N.W. 903, 903–04 (Iowa 1902) (stating the "general rule" that a parent may administer "moderate" corporal punishment to a child); *State v. Gillett*, 9 N.W. 362, 363 (Iowa 1881) (approving a jury instruction to that effect).

**II. We Should Decide the Entire Case, Not Just the Part the Majority Chooses to Decide.**

Finally, the majority's refusal to decide the actual appeal before us amounts to an abdication of responsibility. White contends that *only* in-person confrontation satisfies the Iowa Constitution. Meanwhile, the majority concludes that the use of a one-way video system violates the Iowa Constitution, but it does not decide whether a two-way video system complies with the Iowa Constitution. In short, the majority is not giving White what he asks for while also guaranteeing another appeal if he gets less than he asks for. Why isn't the majority deciding the entire case? Surely the majority doesn't think it needs more briefing on article I, section 10 or that new insights may emerge. Does the majority anticipate that some new authoritative treatise on the 1857 Iowa Constitution will be published between now and a potential second appeal? I doubt that will occur.

The majority protests that the "record does not describe an actual two-way system." The majority turns a blind eye to the fact that we are all very familiar with two-way video systems, having been through the changes wrought by the COVID-19 pandemic. The majority knows what is possible with two-way video and should either approve such a procedure or indicate that the in-person appearance of a child witness is always required.

This is exactly the type of remand that a trial court judge dreads. A third trial would further traumatize the child witnesses. At a minimum, I would hold two-way video on this record does not violate the defendant's confrontation rights under the Iowa Constitution. *See, e.g., State ex rel. Montgomery v. Kemp*, 371 P.3d 660, 666 (Ariz. Ct. App. 2016) (adopting *Craig* under the Arizona Constitution and approving use of a two-way video system).

For these reasons, I do not believe the defendant's right to confrontation was violated when minors M.W. and J.W. testified through a one-way television system that allowed the defendant to observe and hear their testimony. Therefore, I must respectfully dissent and would affirm the defendant's convictions.

Waterman and Mansfield, JJ., join this dissent.